Abraham SIEGEL, Regional Director of Region 31 of the National Labor Relations Board, For and on Behalf of the NATIONAL LABOR RELATIONS BOARD, Petitioner,

v.

MARINA CITY COMPANY, Respondent.

Civ. A. No. 770864–AAH.

United States District Court, C. D. California.

March 31, 1977.

Daniel F. Altemus, Jr., Santa Monica, Cal., for petitioner Abraham Siegel.

Latham & Watkins by Bennett W. Root, Jr., Los Angeles, Cal., for respondent Marina City Co.

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

HAUK, District Judge.

The Court having duly considered the memoranda and supporting affidavits and the oral argument of the respective counsel, hereby makes the following findings of fact and conclusions of law:

## I

## FINDINGS OF FACT

1. Petitioner is Regional Director of Region 31 of the National Labor Relations Board (the "Board"), an agency of the United States, and filed the petition herein for and on behalf of the Board on March 9, 1977.

2. Respondent Marina City Company (the "Company") is a partnership duly organized under the laws of the State of California with its office and principal place of business in Marina del Rey, California. There, the Company operates a combined hotel and apartment complex known as Marina City Club (the "Club") from which it annually purchases and receives goods or services valued in excess of $5,000 from sellers or suppliers located within the State of California, which sellers or suppliers received such goods in substantially the same form directly from outside the State of California. The Company operates on a November 1 to October 31 fiscal year.

3. The jurisdiction of this Court is invoked pursuant to Section 10(j) of the National Labor Relations Act, as amended (the "Act") [29 U.S.C. Section 160(j)].

4. From the time the Club first opened in 1971 until February, 1975, the Company used independent outside services to provide security guard service at the Club. In February, 1975 the Company brought the security guard service in-house.

5. During 1976, the Company began to have increasing problems with its in-house security guard service at the Club. In March, 1976, it had an independent outside security consultant survey the Club and its security guard services and make recommendations for improvements.

6. Thereafter, following a period of some improvement, the problems with the in-house security guard service continued to increase. During that period the tenants of the Club became increasingly critical of that security guard service.

7. On or about September 28, 1976, a majority of the employees that the Company employed as guards voted by secret ballot to have the Marina del Rey Security Officers Association (the "Association") become their representative for purposes of collective bargaining with the Company and on or about December 15, 1976 Petitioner certified the Association as the exclusive collective bargaining representative of those employees.

8. During October and November, 1976, as a result of the increasing problems with its in-house security system and in conjunction with its fiscal projections for the fiscal year beginning November 1, 1976, the Company had independent outside security services survey the Club and its security. As a result of deficiencies in the security system revealed by these surveys, the Company began to consider reverting to its prior practice of using outside guard services to provide security guard service at the Club.

9. On November 8, 1976, the President of the Company wrote the Association and informed it that the Company was considering contracting out the security guard ser-

vice and requested that the Association contact the Company's attorneys if it wished to discuss the matter.

10. On or about December 2, 1976, the Association and the Company met to discuss the question of whether the Company would contract out the security guard service. At that meeting, the Company made the following proposal: First, those employees then on the payroll would continue to work until December 5, 1976. Second, upon termination all employees would be eligible for vested benefits as of December 5, 1976 such as vacation pay and Christmas bonus. Third, in addition to the listed benefits, those employees who were not offered a position by the contractor would get severance pay equal to (i) a half day's pay for each month of work (defined as 15 days or more of work) from their date of hire until November 30, 1976, up to a maximum of 5 days, plus (ii) an amount equal to their straight time wages for the seven day period ending December 2, 1976. Fourth, all employees would also be given the right to apply for other jobs at the Club.

11. The Association made no response to the proposal. Instead, it adjourned the meeting and stated that it had to meet again to bargain further about the effects of the contracting decision. It gave no indication that it wished to bargain further about the decision itself.

12. Thereafter, a second negotiating session was scheduled for December 6, 1976 but then cancelled due to the illness of the Association's attorney. On December 6, 1976 an attorney for the Company telephoned the Association's attorney and left a message with his office that the Association's attorney should respond as soon as possible in order to reschedule the second negotiating session.

13. On December 8, 1976 the Company received reports that there had been a car broken into and a theft the night before at the Club. The Company reported these incidents to its attorneys early in the morning of December 8, 1976. During that morning, the Company's attorney telephoned the Association's attorney twice and on each occa-

sion was told that the Association's attorney was on the telephone. On each occasion, the Company's attorney left an urgent message that the Association's attorney should return the telephone call as soon as possible.

14. By late afternoon, December 8, 1976 neither the Company nor its attorneys had received any response to any of the phone calls to the Association's attorney. That afternoon the Company, through its attorneys, wrote the Association's attorney that it had decided to contract out the security guard service and requested that the Association contact the Company no later than December 10, 1976 if it still wished to discuss that decision. The Association never made such a request.

15. Between December 10 and December 13, 1976, the Company terminated all of its guard employees. On December 13, 1976, the Company executed a contract whereby it contracted out the security guard service at the Club.

16. The Association filed charges with the Board on or about November 22, 1976 and on or about December 10, 1976, pursuant to the provisions of the Act, alleging that the Company had engaged in certain unfair labor practices within the meaning of Sections 8(a)(1), (3) and (5) of the Act by contracting out the security guard service at the Club.

17. On January 19, 1977, the Company's attorneys again notified the Association that the Company was still prepared to bargain about the effect of the decision to contract out the guard service. No one from the Association ever responded to that letter.

18. On or about January 21, 1977, the General Counsel of the Board, on behalf of the Board, by the acting Regional Director, issued a consolidated complaint pursuant to Section 10(b) of the Act, alleging that the Company had engaged in unfair labor practices within the meaning of Section 8(a)(1), (3) and (5) of the Act.

19. At the time of hearing on the petition the administrative hearing on the

above-referenced unfair labor practice charges was scheduled to begin on March 24, 1977.

20. Since September, 1976, in addition to the Association, two other groups of employees at the Club have elected two separate unions as their respective exclusive collective bargaining agents. Subsequent to those elections, the Company has executed a collective bargaining agreement with one of those unions and is negotiating with the other union about such an agreement.

21. Based on the facts set forth in paragraphs 4 through 20 above, I find that the Company contracted out the security guard service at the Club solely for business reasons and the Company has at all times since November 8, 1976 been willing and available to bargain with the Association in good faith about the decision or the effects thereof. I further find that the Association has refused to bargain in good faith with the Company and failed to test the Company's good faith. Accordingly, on all of the facts before the Court I find that there is no reasonable cause to believe that the Company either discharged its guard employees in violation of Section 8(a)(3) of the Act [29 U.S.C. Section 158(a)(3)] or refused to bargain with the Association in violation of Section 8(a)(5) of the Act [29 U.S.C. Section 158(a)(5)].

22. Based upon the facts set forth in paragraphs 4 through 20 above, I further find that the issuance of a preliminary injunction in this case would neither preserve the status quo nor effectuate the purposes of the Act, and that granting such relief is not equitably necessary in that:

(a) A preliminary injunction could not preserve the status quo because the Board has waited three months since the alleged unfair labor practices occurred before filing its petition herein;

(b) The normal Board procedures which are scheduled to begin on March 24, 1977 can provide the Association with a full and complete remedy thereby making the preliminary injunction unnecessary to effectuate the policies of the Act; and

(c) The issuance of a preliminary injunction would be unjust and inequitable because the Company has not engaged in any flagrant violation of the Act, because an injunction would require a massive change in the Company's operations and jeopardize its employees, tenants and visitors, and because the Association comes before this court with unclean hands by refusing to bargain with the Company about the contracting decision.

From the foregoing facts the Court concludes:

## II

## CONCLUSIONS OF LAW

1. In all respects as set forth in the foregoing Findings of Fact.

2. This Court has jurisdiction over the petition filed herein pursuant to Section 10(j) of the Act [29 U.S.C. Section 160(j)].

3. There is no reasonable cause to believe that the Company violated either Section 8(a)(3) or 8(a)(5) of the Act [29 U.S.C. Section 158(a)(3) or (5)]. *Edward Axel Roffman Association, Inc.,* 147 NLRB 717 (1964); *The Emporium,* 221 NLRB 1211 (1975).

4. The issuance of the relief sought herein is not just and proper under the circumstances. *San Francisco-Oakland Newspaper Guild v. Kennedy,* 412 F.2d 541 (9th Cir. 1969); *Boire v. Pilot Freight Carriers, Inc.,* 515 F.2d 1185 (5th Cir. 1975), *reh. den.,* 521 F.2d 795.

5. The issuance of an injunction would not be just and proper under Section 10(j) of the Act [29 U.S.C. Section 160(j)].