Michael S. MARAM, Acting Regional Director of Region 24 of the National Labor Relations Board, for and on Behalf of the NATIONAL LABOR RELATIONS BOARD, Petitioner,

v.

UNIVERSIDAD INTERAMERICANA DE PUERTO RICO, INC., Respondent.

Civ. No. 83–0020(JP).

United States District Court,
D. Puerto Rico.

Feb. 17, 1983.

Michael S. Maram, Acting Regional Director, N.L.R.B., Region 24, Hato Rey, P.R., for petitioner.

Lespier, Muñoz, Noya & Ramirez, San Juan, P.R., for respondent.

## OPINION AND ORDER

PIERAS, District Judge.

This is an action brought by the Acting Regional Director of the National Labor Relations Board, (the Board), pursuant to Section 10(j) of the National Labor Relations Act (the Act), 29 U.S.C. Section 160(j), for temporary injunctive relief pending the final decision by the Board of certain unfair labor practice charges filed against Respondent, Universidad Interamericana de Puerto Rico, Inc., (the University), by the Congreso de Uniones Industriales de Puerto Rico, (the Union), a labor organization. An evidentiary hearing on the Petition was held from January 19 to January 25, 1983, after which the Board presented oral argument and the University submitted a written brief in support of its position.

Caribe Cleaning Services, Inc., an affected third party, requested and was granted permission to participate in this proceeding as Intervenor, it was allowed to present evidence and to submit a written brief on its behalf.

The questions before us are twofold:

A) Whether on the basis of the evidence presented by Petitioner, there is reasonable cause to believe that the Respondent has committed the unfair labor practice alleged; and

B) Whether temporary injunctive relief pending a final decision by the Board on the merits, is "just and proper" in effectuating the purposes of the Act.

From the testimony and demeanor of the witnesses and the documentary evidence presented at the hearing, this Court makes the following

## FINDINGS OF FACT

1. Respondent, "the University" is a private educational entity, organized island-wide and composed of two main campuses, six Regional Colleges, a School of Law, and a School of Optometry. The instant case concerns the Metropolitan Campus (the Campus) which consists of educational facilities located at Bayamón and Río Piedras. The Río Piedras facilities of the Metropolitan Campus consist of a modern new building inaugurated in January 1982.

2. For the first semester of academic year 1982–83 (from August 30, 1982 to December, 1982) 16,200 students were enrolled at the Campus, of which about 12,600 studied at the Río Piedras facilities and 3,200 studied at Bayamón.

3. The University built new facilities at a cost of about $20,000,000.00 at the new Río Piedras Campus (Road # 2), which was to be inaugurated January 1982.

4. In view of the size and complexity of the new Río Piedras Campus and the increased enrollment in Río Piedras and Bayamón Campus, the University officers started to study the possibility of having the janitorial service performed by an independent contractor, which would be more efficient and less costly. To this effect, Dr. Rafael Cartagena, Chancellor of the Metropolitan Campus, requested on July 1981 that Mr. Edwin Hernández, Dean of Administration, solicit from companies specialized in cleaning services, proposals to perform janitorial work for the Campus.

5. During the months of July, September, October and November 1981, the University requested and received bids and proposals from three (3) cleaning companies: Antilles Cleaning Services, Caribe Cleaning Services, Inc. and Auburn Building Maintenance (Joint Exhibits A through E).

6. After studying and considering the various proposals (see Joint Exhibits F and G), the University officials met at the offices of the President on December 2, 1981, to discuss the subcontracting alternatives. Dr. Rafael Cartagena recommended to the

President of the University, Dr. Ramón A. Cruz, that Caribe Cleaning Services be subcontracted to do the Campus cleaning work in Río Piedras and in Bayamón. The President decided to forestall subcontracting the janitorial services at the moment because he was unwilling to terminate the janitorial employees during the Christmas season and wished to afford these employees an opportunity to demonstrate that they could perform the cleaning services efficiently and satisfactorily at the new educational facilities.

To this effect, Caribe Cleaning Services, Inc. was contracted on January 4, 1982 to train the janitorial employees of the Campus and to recommend the purchase of industrial equipment and supplies. (Joint Exhibits H and J). This contract was for ninety (90) days and it ended on March 31, 1982.

7. The janitorial services at the Campus did not improve and were unsatisfactory, inefficient and there were numerous complaints.

8. On July 1, 1982, the University retained System for Planning and Management, Inc. as a consultant to implement everything that came under building and grounds which included cleaning, security, maintenance, physical plan and transportation in the Campus. (Joint Exhibit I). (See Cartagena's testimony). Engineer Duhamel Rivera, President of the firm, was informed that the main problem was the cleaning program and the necessity of establishing an administrative plan to prevent deterioration of the physical plant. After an evaluation of the cleaning services at the Campus, Engineer Rivera met on August 2, 1982 with the janitorial employees. At that meeting, Engineer Rivera indicated the need to improve the cleaning services.

9. On August 30, 1982, the first semester for academic year 1982–83 commenced. On this date, Engineer Rivera implemented a new work-schedule for the janitorial employees. This new schedule consisted in changing the work week from five to six days and changing the workshifts from daytime to nighttime.

10. Mr. José Alberto Figueroa, Charging Union Organizer enrolled at the University and started classes on August 30, 1982. Immediately, he started the organizational efforts of the Union. After August 30, 1982, Mr. José Alberto Figueroa met off Campus on five or six occasions with Mr. Angel David González, a janitorial employee. Then, Figueroa began meeting with other employees at their residence. The Union obtained some authorization cards September 15, 1982. Prior to September 20, 1982, neither the Union nor any of the employees engaged in any type of open or manifest union organizational activity such as holding meetings at the Campus, handbilling or picketing.

11. On September 7 and 8, 1982 Chancellor Cartagena held, at the Cerromar Hotel, a meeting with the Deans of the Campus. At said meeting, the cleaning services' inadequacy and inefficiency at the Campus were, once again, underscored by the Deans.

12. The cleaning effort in August was at a proper level, but, after the commencement of classes, in August 30, 1982 the level deteriorated. Duhamel Rivera held a meeting on September 10, 1982 with the janitorial employees, where they requested additional personnel and a change in the working schedule just implemented.

13. By September 15, 1982, Engineer Rivera's evaluation had been prepared and he submitted it to the Chancellor containing a supplementary budget request calling for twelve and a half (12½) new janitorial positions and for a budgetary increment of $166,100.00. (Joint Exhibit K).

14. Upon receipt of this request, the Chancellor asked Engineer Duhamel Rivera if he had considered and compared the cost of the University's cleaning operation, including the additional request, vis-a-vis the cost of the proposal submitted by Caribe Cleaning. The Chancellor also asked Engineer Rivera if with the additional amount of money requested he could guarantee a good cleaning service. Engineer Rivera answered "no" to both questions. Therefore, the Chancellor requested that he discuss the

matter with Dean Hernández so that the Dean could submit to him a comparative cost analysis.

15. In the afternoon of September 15, 1982, Engineer Rivera met with the cleaning employees and informed the employees of the necessity to improve the work because the University was still not satisfied.

16. On September 16, 1982, Engineer Duhamel Rivera and Jesús Rivera, Maintenance Director, met separately with Mr. Angel David González and René Oyola, janitorial employees, for the purpose of soliciting support from Mr. Angel David Rivera and other employees in implementing the new work program. That was the only matter discussed.

17. On September 16, 1982, Dean Hernández submitted to Dr. Cartagena the comparative cost analysis study of the difference between subcontracting and having the Campus operate the cleaning services. (Joint Exhibit L). The study demonstrates that the University would save nearly a quarter of a million dollars ($247,826.00) during fiscal year 1982–1983 by subcontracting its janitorial work to Caribe Cleaning Services.

18. On Friday, September 17, 1982, at about 8:30 a.m., the Chancellor met with the President of the University to discuss the supplementary budget of the Campus, among other administrative matters. At said meeting, Dr. Cartagena presented the request for additional funds that Engineer Duhamel Rivera had prepared for the maintenance area and talked specifically about the janitorial situation. Dr. Cartagena recommended to the President that his original recommendation to subcontract the cleaning services be implemented in view of the fact that all the efforts made to improve the cleaning had failed to provide positive results, and that a comparative cost analysis showed annual savings for the University in the amount of $247,826.00 by subcontracting.

The President accepted Dr. Cartagena's recommendation and at that moment, it was decided to subcontract the services of Caribe Cleaning Services, Inc.

19. The employees of Caribe Cleaning Services, Inc. are unionized and are members of the Unión de Producción de Trabajadores y Técnicos de Puerto Rico, a bona fide labor organization, and have been so for more than sixteen years. The University officials were aware of this fact since December 1981.

.20. Once the decision to subcontract the janitorial work was made, the President requested that Mr. Félix Ocasio, Vice-President for Administration, participate in the meeting in order to discuss the implementation of the subcontract. Mr. Ocasio's main concern was that if the affected employees learned about the subcontracting decision before it was implemented, such knowledge would create serious security problems for the University. He suggested, therefore, that the implementation measure be taken as soon as possible in order to avoid the potential acts of sabotage and vandalism that a premature disclosure could produce. His concern was rooted in past experience, particularly in light of the acts of sabotage and vandalism that the University experienced in 1972 and 1976. Mr. Ocasio expressed concern that since the janitorial employees had access to sensitive areas of the Campus, such as the computer room, audiovisual room, laboratories, and others, they could express their dissatisfaction with the subcontracting decision and vent their anger by sabotaging such areas.

21. Dean Hernández called Mr. José Fermaint, General Manager of Caribe Cleaning Services, Inc., and Monday, September 20, 1982 was set as the starting date.

22. On September 20, 1982, on or about 3:00 P.M., the cleaning employees were informed that it had been decided to subcontract the cleaning services of the Campus and that Caribe Cleaning Services, Inc. was the company subcontracted. Simultaneously with their termination letter, the employees were given an employment offer by Caribe Cleaning Services, Inc. (See Joint Exhibit O).

23. On September 22, 1982, Caribe Cleaning Services, Inc. sent another letter to the employees extending its original offer of employment with the Company until September 28, 1982. (Joint Exhibit P). The record shows that there was not a timely response to the second employment offer by the former University employees and, as a result, Caribe Cleaning Services, Inc. proceeded to hire the new employees needed.

24. The University Officials did not know, at the time of the decision to subcontract the janitorial work, that the employees were being approached by a Union which was trying to organize them. As a matter of fact, said officers did not threaten, coerce, promise, or otherwise talk to the employees on whether they should or should not join the Union, or even talk to them about a Union.

25. The janitorial problem created by the new Campus and increment in students had been the subject of study since mid 1981 and the possibility of sub-contracting a real fact which was being considered as a solution to the problem. The only reason the janitorial work was sub-contracted was to provide better service at a lower cost.

26. There is no reasonable cause to conclude that the conduct of the University in dismissing the janitorial employees and subcontracting was based on an anti-union motive rather than the legitimate principles of good administration. Therefore, there is no reasonable cause to believe that an unfair labor practice was committed by the University.

In view of the aforestated conclusions of fact, the Court enters the following conclusions of law:

## A. THE SECTION 10(j) INJUNCTION

■ Section 10(j) of the National Labor Relations Act, 29 U.S.C. Sec. 160(j), empowers the District Court, upon petition by the Board to grant the Board such temporary relief or restraining order as it deems just and proper. It is a statutory exception to the general principle embodied in the Norris-La Guardia Act, 29 U.S.C. Sec. 101, et seq., which denies jurisdiction to the federal courts to issue injunctions in matters arising from labor disputes. As a statutory exception, the discretion of the district court is limited to the narrow jurisdiction conferred by Section 10(j) and should be utilized only upon a showing that the remedial purpose of the Act would be frustrated unless extraordinary action is taken. *Minnesota Mining Manufacturing v. Meter,* 385 F.2d 265, 270 (8th Cir.1967). The Eighth Circuit in *Minnesota Mining, supra,* declared as follows:

> "In our view, as suggested by the quoted excerpt from the Senate Report the district judge's discretion in granting temporary relief under Section 10(j) cannot be activated or motivated solely by a finding of 'reasonable cause' to believe that a violation of the Act has occurred. More is required to guide his permissive range of discretion. Section 10(j) is reserved for more serious and more extraordinary set of circumstances where the unfair labor practices, unless contained, will have an adverse and deleterious effect on the rights of the aggrieved party which cannot be remedied from the normal Board procedures. In determining the propriety of injunctive relief, the district court should be able to conclude with reasonable probability from the circumstances of each case that the remedial purpose of the Act will be frustrated unless immediate action is taken. To hold otherwise and condition the granting of temporary relief solely on the determination of 'reasonable cause' would effectually circumvent the normal NLRB process established by the Act and muddle the proper allocation of administrative and judicial functions."

A similar caveat was articulated in *McLeod v. General Electric Company,* 366 F.2d 847, 849 (2d Cir.1966), set aside and remanded on other grounds, 385 U.S. 533, 87 S.Ct. 637, 17 L.Ed.2d 588 (1967). There, the Second Circuit held that Section 10(j):

> "... in no way change(s) the extraordinary nature of the injunctive remedy. Nor did it change the basic purpose of the NLRA which envisions a system in which

the Board would, in the first instance, consider and decide the issues arising under the Act and pending before it, subject to a later review by the Court of Appeals. The Board, generally, has properly restricted itself to seeking injunctions only in cases of extraordinary circumstances, exercising its power 'not as broad sword, but as a scalpel, ever mindful of the dangers inherent in conducting labor management relations by way of injunction.' "

Although the above articulations may overstate the limited nature of the Section 10(j) relief, we are nevertheless in agreement that interim injunctive relief under that Section is limited to those facts and circumstances in which there is substantial threat to the free flow of commerce or where the remedial purposes of the Act would otherwise be stymied. *Unión de Tronquistas de Puerto Rico, Local 901 v. Arlook,* 586 F.2d 872 (1st Cir.1978); *Boire v. International Brotherhood of Teamsters, et al,* 479 F.2d 778 (5th Cir.1973). In examining the propriety of Section 10(j) relief, we adopt the two-tiered test used by the majority of Courts of Appeals: Whether there is reasonable cause to believe that unfair labor practices have been committed and, if so, whether the requested relief is "just and proper" in terms of effectuating the purposes of the Act. *Fuchs v. Hood Industries,* 590 F.2d 395 (1st Cir.1979); *Squillacote v. Local 248,* 534 F.2d 735 (7th Cir.1976). Based on the facts in this case, we examine each part of the test independently.

### (1) REASONABLE CAUSE

In determining whether there is reasonable cause to believe that a violation of the Act has occurred, the Board "need only show the existence of credible evidence, even if disputed, together with reasonable inferences which support its conclusions." *Local 901, supra* at 876. This burden of persuasion, however, does not mean that an injunction will be issued in a perfunctory manner or that this Court is limited to "rubber stamping" the Board's deter- mination as to the necessity of temporary relief. *Fuchs v. Hood Industries,* 471 F.Supp. 186 (D.C.Mass.1979), on remand from *Fuchs v. Hood Industries,* 590 F.2d 395 (1st Cir.1979). Mere allegations, suspicions, speculation, surmise or forced inferences will not suffice; the evidence must be credible and consistent, the inferences must be reasonable.

In addition, in examining the reasonable cause test, we must take into account a recent development in Board law. In *Wright Line,* 251 NLRB 1083 (1981), the Board adopted a "but for" test as the substantive standard for evaluating the lawfulness of employer conduct. Under the test previous to *Wright Line,* the Board considered a discharge violative of the Act, if it was taken "in part" due to anti-union animus. Under the *Wright Line* "but for" test, the employer's conduct will be found lawful if he can satisfy the burden of demonstrating that said conduct would have taken place even in the absence of protected conduct. The burden of proof that the Board must comply with is of demonstrating that there is reasonable cause to believe that Respondent's decision to subcontract janitorial services would not have taken place, but for the organizational activity of its employees.

This Court does not believe that the Board has met this test. The undisputed evidence on the record demonstrates that the University had been seriously examining the subcontracting option since at least July 1981, in contemplation of the inauguration on January 1982, of its new education facilities at Río Piedras. To this effect, studies were undertaken, bids were requested, proposals were submitted, and recommendations were made. During the following months, the conduct of the University officers shows that they were trying to find a solution and continued studying all possibilities until a final decision was reached on September 17, 1982 to sub-contract the janitorial services. At that time, the studies as to feasibility and costs were completed and before the President of the University.

■ The first date of the Union's organizational activity was on or about August 30, 1982, the day on which the Fall Semester began. It is the Board's suggestion that it was the initiation of this organizational activity that precipitated the subcontracting decision of the University taken on September 17, 1982. On the basis of the evidence, the Court cannot accept the Board's inferences as reasonable. There is no evidence on the record indicating that as of September 15, 1982, the University, through its officials, had any knowledge of Union organizational activity. A representation petition was not filed with the Board until after the sub-contracting decision was implemented, that is, September 20, 1982. The evidence only indicates that as of September 17, such Union activity was limited to a handful of employees outside the premises of the Campus. On the basis of this limited activity, this Court cannot conclude that there is reasonable cause to believe that such activity was the motivating factor behind the sub-contracting decision of September 17. The only considerations justifying the sub-contracting was the poor performance of the janitors and the savings involved in employing the subcontractor. It is a well-established doctrine that an employer does not violate Section 8(a)(1) and (3) of the Act, if the decision to subcontract some of its services is motivated by legitimate business reasons. *Elliott River Tours,* 246 NLRB No. 149 (1979); *Alton-Arlan's Department Store v. NLRB,* 355 F.2d 513 (7th Cir.1966).

On the basis of the evidence on the record, we conclude that the Board has been unable to demonstrate that there is reasonable cause to believe that the subcontracting of the janitorial services would not have taken place but for the isolated incidents of organizational activity which is alleged to have taken place. As the Board itself has noted, while it is rarely possible to obtain direct evidence of an employer's discrimination, circumstantial evidence must produce more than just conjecture, surmise and suspicion of discrimination. *Production Molded Plastics,* 227 NLRB No. 104 (1972). In our view, the Board's inferences stagger in the netherworld of suspicion and conjecture without reaching the realm of the reasonable and the probable.

For these reasons, we cannot conclude that the Board has met the first part of the two-tiered test utilized to determine the propriety of Section 10(j) relief. *Fuchs v. Hood Industries, supra; Siegel v. Marina City,* 428 F.Supp. 1090 (D.C.Cal.1977).

### (2) JUST AND PROPER

■ Assuming *arguendo* that the Petitioner has produced credible evidence which, when coupled with reasonable inferences, will support its conclusion that there exists reasonable cause to believe that the employer's subcontracting decision was causally related to its anti-union animus, we do not believe that under the facts and circumstances of this case, interlocutory injunctive relief is a "just and proper" exercise of this Court's equitable jurisdiction.

In *Angle v. Sacks,* 382 F.2d 655 (10th Cir.1967), the Court stated that Section 10(j) relief may be appropriate "when the circumstances of the case created a reasonable apprehension that the efficacy of the Board's final order may be nullified, or that administrative procedure will be rendered meaningless".

This Court finds that the remedial purposes of the Act would not be frustrated by the denial of Section 10(j) relief. Should the Board eventually determine, upon a full evidentiary hearing on the merits, that the subcontracting decision was solely and principally motivated by anti-union animus, the affected employees will still retain their rights to reinstatement, with corresponding back-pay plus interest from the date of their discharge. Furthermore, we cannot state that denial of the petitioned relief will chill further unionism at the worksite, since the subcontractor's employees are unionized employees.

On the other hand, the granting of the requested relief would cause upon Respondent, Intervenor, and Intervenor's employees substantial, immediate and irreparable harm. Interim relief pending a final dispo-

sition on the merits means that Respondent would be forced to cancel the Intervenor's contract, the subcontractor's employees would be left without a job, and the University will incur in added expenses calculated at $247,826.00. Should the Board eventually decide on the merits in favor of Respondent University, the economic injuries inflicted upon Respondent and Intervenor, and particularly upon the Intervenor's employees working at the Campus, would have no redress under law. The possibility of this result, particularly in the absence of an adjudication on the merits, offends the most fundamental notions of justice and fairness and calls for judicious exercise of this Court's discretion in granting the Section 10(j) relief requested.

In *Crain v. Fabsteel,* 427 F.Supp. 316 (W.D.La.1977), the District Court refused to order reinstatement under Section 10(j) of approximately thirty (30) employees who had been discharged by an employer allegedly in violation of Section 8(a)(3) of the Act. There the Court stated:

"If the Court wrongly issues an injunction, a substantial (approximately 30) number of people will be mistakenly thrown-out of work until the Board acts and this injunction is dissolved. This would wreak havoc and cause destruction in the lives of such unoffending individuals and the plant."

The *Crain* Court noted that the striking employees would not suffer any irreparable harm by the denial of the 10(j) injunction, since should the Board rule in their favor "the strikers will be returned to work, and will still have their remedies of back-pay and seniority restored in the plant." *Crain* at 318.

In *Mack v. Air Express International,* 471 F.Supp. 1119 (N.D.Ga.1979), the Board requested reinstatement under Section 10(j) of five (5) workers discharged during the Union's organizational campaign. Although the Court found that there was reasonable cause to believe that a violation of the Act had occurred, it denied the requested injunction because it deemed that such relief would not be just and proper. It noted that reinstatement of the five (5) employees would require layoff of five (5) other employees.

The *Crain* and *Mack* decisions foreshadowed a recent Supreme Court decision that lends considerable support to the Respondent's position that interim reinstatement that affects the rights of replacements pending a final decision on the merits of the alleged violations, may so adversely affect the right of innocent third parties that it might be completely unwarranted as an interim remedial measure. Although the controversy in *Ford Motor Company v. E.E. O.C.,* —— U.S. ——, 102 S.Ct. 3057, 73 L.Ed.2d 721 (1982), arose under Title VII, the Court specifically noted that principles developed under Title VII, may provide an analogous interpretation to principles to be developed under the Act.

The issue in *Ford Motor Company, supra,* was whether an employer charged with discrimination hiring under Title VII of the Civil Rights Act of 1964 can control the continuing accrual of back-pay liabilities under Section 706(g) of the Act, by unconditionally offering the claimant the job previously denied, but without offering retroactive seniority to the date of the alleged discrimination. The lower court had ruled that back-pay liability could only be tolled by offering the alleged discriminatee complete reinstatement including retroactive seniority to the date of the alleged discrimination.

In rejecting such argument, the Court, *inter alia,* stressed the damage that this holding would have on the rights of "innocent third parties".

These considerations are particularly applicable to the case at hand, where the evidence on the record reveals that the economic harm being suffered by the discharged employees is partially self-inflicted, insofar as the Intervenor offered these employees a job with its company upon termination by Respondent. The record reveals that the terminated employees opted not to timely accept the Caribe Cleaning offer of employment.

A final factor in considering whether injunctive relief would be just and proper under these circumstances, is the delay engaged in by the Board in requesting this relief. The initial charge in this case was filed by the Union before the Board on September 21, 1982. It is not until January 12, 1983, that the Board petitioned this Court for a Section 10(j) relief. The Board's hearing in the underlying charge is scheduled for February 22, 1983, scarcely three weeks hence. Under these circumstances, we think it is appropriate to quote from *Boire v. Pilot Freight Carriers, Inc.*, 515 F.2d 1185 (5th Cir.1975), where the Fifth Circuit affirmed the district court's refusal to issue an injunction when the Board had taken over ninety (90) days to solicit said injunction. In such case, the Court noted the following:

> "Nor did the District Court abuse its discretion in failing to order reinstatement of the two employees arguably discharged for Union activity. The Board waited three months before petitioning the District Court for temporary relief. Although the time span between the commission of the alleged incurred labor practices and filing for Section 10(j) sanctions is not determinative of whether relief should be granted, it is some evidence that the detrimental effects of the discharges has already taken their toll on the organizational drive. It is questionable whether an order of reinstatement would be any more effective than a final Board order at this point."

Unquestionably, the Board's delay takes away from the urgency of offering interim relief. As in *Boire, supra,* this Court is not convinced that interim relief at this point would be more appropriate or effective than the forthcoming Board proceedings in this matter.

This Court cannot conclude that interim injunctive relief would be just and proper in the case at bar.

For the above reasons, Petitioner's request for Section 10(j) injunctive relief is hereby DENIED.

IT IS SO ORDERED.