Michael S. MARAM, Acting Regional Director of Region 24 of the National Labor Relations Board, For and Behalf of the National Labor Relations Board, Petitioner, Appellant,

v.

UNIVERSIDAD INTERAMERICANA DE PUERTO RICO, INC., Respondent, Appellee.

No. 83–1246.

United States Court of Appeals, First Circuit.

Argued Sept. 13, 1983.

Decided Dec. 14, 1983.

Jean Seibert Stucky, Atty., Washington, D.C., with whom William A. Lubbers, Gen. Counsel, John E. Higgins, Jr., Deputy Gen. Counsel, Harold J. Datz, Associate Gen. Counsel, Joseph E. Mayer, Asst. Gen. Counsel, and Joseph P. Norelli, Deputy Asst. Gen. Counsel, N.L.R.B., Washington, D.C., were on brief, for petitioner, appellant.

Francisco M. Ramirez Rivera, San Juan, P.R., with whom William Lespier, Francisco M. Ramirez, Agustin Collazo, San Juan, P.R., and Lespier, Munoz Noya & Ramirez, Hato Rey, P.R., were on brief, for respondent, appellee.

Vincente J. Antonetti, Santwice, P.R., with whom Goldman & Antonetti, Santwice, P.R., was on brief, for intervenor Caribe Cleaning Services, Inc.

Before CAMPBELL, Chief Judge, ALDRICH and COWEN *, Senior Circuit Judges.

BAILEY ALDRICH, Senior Circuit Judge.

The National Labor Relations Board appeals from the denial of its application for a preliminary injunction under section 10(j) of the NLRA, 29 U.S.C. § 160(j), requiring Universidad Interamericana de Puerto Rico to restore its discharged janitorial employees pending resolution of an underlying unfair labor practice proceeding. The district court, applying a two-step analysis used by many circuits, see *Solien v. Merchants Home Delivery Service, Inc.,* 8 Cir., 1977, 557 F.2d 622, 626, found no reasonable cause to believe that an unfair labor practice had been committed, and concluded that, in any event, an injunction would not be "just and proper." *Maram v. Universidad Interamericana de Puerto Rico, Inc.,* D.P.R., 1983, 559 F.Supp. 255, 262, 264. We disagree with both conclusions, and rule that an injunction should issue.

The controversy centers around defendant University's wholesale firing of the janitorial forces at its new Rio Piedras campus, on September 20, 1982. In their stead, University subcontracted Caribe Cleaners, Inc., intervenor, to maintain the campus, at a considerable financial saving. The Board charges the firing was principally intended to thwart a union organizing effort, and that University violated 29 U.S.C. §§ 158(a)(1) and (3). University claims it had no knowledge of any union organizing on September 17, when the decision to subcontract was made, and that the discharge was purely a business decision.

* Of the Federal Circuit, sitting by designation.

*Facts*

The district court held a five-day, trial type hearing. The record shows that University began to reevaluate its maintenance services in July, 1981, in contemplation of switching its main campus from Bayamon to new facilities in Rio Piedras. It solicited and received bids from three independent contractors, including Caribe Cleaners. In December 1981, however, University President Cruz rejected University Chancellor Cartegena's suggestion that Caribe be hired to do the cleaning, and, instead, hired Caribe merely to train University's present employees. The janitors began work at the Rio Piedras campus on January 20, 1982. Caribe's training contract expired at the end of March. By that time, University officials already had received many complaints about the quality of maintenance, and Caribe's contract was not renewed. Instead, on July 1, 1982, University retained System for Planning and Management to consult and supervise on matters relating to business and grounds. System, through its President Duhamel Rivera, was instructed to concentrate on the cleaning program and on a plan to prevent deterioration of the physical plant.

On August 2, 1982, Duhamel Rivera met with the janitorial employees and told them of a need to improve cleaning services, and on August 30, the day fall semester classes started, implemented a new work schedule calling for a six-day week, placing the emphasis on night shift cleaning. Also on August 30, union organizer Jose Figeroa enrolled at the Rio Piedras campus. Prior to that date, Figeroa had been in touch with one or more janitorial employees in an attempt to organize a union. Although the record is cloudy, after that date Figeroa apparently met several times with employee Angel Gonzalez, and with other employees. None of this activity took place on campus. On September 15 and 16, employees Gonzalez and Rene Oyola distributed, and received back signed, some union authorization cards. There is no claim that University knew of union organizing before this.

Meanwhile, University's concern with its cleaning program continued. On September 7 and 8, Chancellor Cartegena met with the campus Deans and received more complaints about the cleaning. On September 10, Rivera met again with the janitors, who requested additional personnel and a change in the newly implemented work schedule. Pursuant to these suggestions, Rivera prepared a supplementary budget request calling for 12½ new janitors and a budget increase of $166,000, which he presented to Chancellor Cartegena on September 15. Cartegena inquired whether Rivera had considered the subcontracting alternative, and whether Rivera could "guarantee" satisfactory cleaning. Rivera responded negatively, and Cartegena then instructed him to prepare a comparative cost analysis in conjunction with Dean Hernandez. Later that day, Rivera met again with the janitors, told them about the supplementary proposal, and told them that their jobs depended on a good effort in the upcoming months.

University's testimony was that on September 16, Dean Hernandez submitted to Cartegena a written comparative cost analysis showing a $247,826 first year savings from contracting out. This analysis, signed and dated September 16, 1982 by Hernandez, was based essentially on the Caribe bid of 11 months earlier. No one asked Caribe whether the bid was still open. That same day Duhamel Rivera and Jesus Rivera, University's maintenance director, requested meetings with Angel Gonzalez and Rene Oyola. The evidence concerning these meetings is in sharp dispute. The Riveras claimed they planned to see seven "key" janitors over two days, in an attempt to foster support for the new working arrangements. They claim that union organizing was never mentioned. Gonzalez and Oyola, on the other hand, allege they both were asked about union activity, and whether they were passing out cards. In addition, both claim they were warned that union activity could cost them their jobs.

On the morning of September 17 Cartegena met with University President Cruz, and again recommended that Caribe be subcontracted, allegedly based upon the September 16 cost analysis. Cartegena felt the University had "done everything," but "the

situation did not improve," in fact had deteriorated, since more manpower had been requested. Cruz asked whether the Caribe bid was still open. Cartegena requested that Hernandez call Caribe, which he did, finding the bid still open. Cruz allegedly then and there decided to subcontract.

University's testimony was that Cruz then called Felix Ocasio, the Vice President in charge of administration. Ocasio recommended that any change of personnel be carried out as quickly as possible; he wished to avoid employee vandalism and violence that University had encountered in the past. Cruz then inquired how quickly Caribe could begin; the same series of phone calls ensued, and it was reported that Caribe could begin on Monday, September 20. At 4:30 p.m. on Friday, the 17th, Caribe met with University and an understanding was reached. Inter alia, Caribe agreed in principle to buy cleaning materials recently acquired by University, as well as its cleaning inventory. A written agreement, in dollars, was executed on Wednesday, the 22d.

At 4:15 p.m. Monday, the janitors were advised on their immediate termination, and Caribe took over at 7:00 p.m. That same day the union filed a representation petition with the Board.

*Applicable Law*

While the present injunction was sought under section 10(j) of the Act, most of the decided cases arise under section 10(*l*). Section 10(j) reads:

"*The Board shall have power, upon issuance of a complaint* as provided in subsection (b) of this section charging that any person has engaged in or is engaging in an unfair labor practice, *to petition* any United States district court, within any district wherein the unfair labor practice in question is alleged to have occurred or wherein such person resides or transacts business, *for appropriate temporary relief* or restraining order. Upon the filing of any such petition *the court* shall cause notice thereof to be served upon such person, and thereupon *shall have jurisdiction to grant to the Board such temporary relief or restraining order as it deems just and proper.*"

29 U.S.C. § 160(j) (emphasis supplied.) Section 10(*l*) reads:

"Whenever it is charged that any person has engaged in an unfair labor practice within the meaning of paragraph (4)(A), (B) or (C) of section 158(b) of this title, or section 158(e) of this title or section 158(b)(7) of this title, the preliminary investigation of such charge shall be made forthwith and given priority over all other cases except cases of like character in the office where it is filed or to which it is referred. *If, after such investigation, the officer* or regional attorney to whom the matter may be referred *has reasonable cause to believe such charge is true* and that a complaint should issue, *he shall,* on behalf of the Board, *petition* any United States district court within any district where the unfair labor practice in question has occurred, is alleged to have occurred, or wherein such person resides or transacts business, for appropriate injunctive relief pending the final adjudication of the Board with respect to such matter. Upon the filing of any such petition *the district court shall have jurisdiction to grant such injunctive relief or temporary restraining order as it deems just and proper, notwithstanding any other provision of law....*"

29 U.S.C. § 160(*l*) (emphasis supplied). Consideration of the statutory differences is important. We attempt to do this, but with the unhappy realization that no one appears to have done so before, and that many opinions are limited to brief ultimate statements, not always reconcilable even within the circuit.

█ Under section 10(j), the Board has discretionary power to seek interlocutory judicial relief whenever it has charged an unfair labor practice, while under section 10(*l*) it has the obligation to do so; "shall ... petition," if the unfair practice falls within its enumerated sections, notably, secondary boycotts and illegal picketing. The Board points out that the language with respect to the court's powers is the same in

both sections, and says that the "only difference" relates to its own conduct. We disagree. While the general language, underlined above, with respect to the district court under both sections is identical, we believe that Congress intended the court's approach to differ in the same manner as the Board's.

■ In the usual case of preliminary equitable relief, four issues are to be considered: that plaintiff will suffer irreparable injury if the injunction is not granted; that such injury outweighs any harm which granting the relief would inflict; that plaintiff has exhibited a likelihood of success on the merits, and that the public interest will not be adversely affected by the granting of the injunction. *Planned Parenthood League of Mass. v. Bellotti,* 1 Cir., 1981, 641 F.2d 1006, 1009. Normally these interests must be weighed inter sese. *See* J. Leubsdorf, *The Standard for Preliminary Injunctions,* 91 Harv.L.Rev. 525, 541 *et seq.* (1978). However, the special importance that Congress attaches to section 10(*l*) offenses indicates here, at the least, a strong presumption of irreparable harm, with the balance in favor of the charging party, and that the public interest favors the injunction. *Cf. Union de Tronquistas de Puerto Rico v. Arlook,* 1 Cir., 1978, 586 F.2d 872, 876. Consequently we agree with those courts that say that in a section 10(*l*) case the judicial inquiry is only, or at least primarily, whether there is reasonable cause to believe a section 10(*l*) offense has been committed. Further, "When 'reasonable cause to believe' turns on disputed issues of fact, the Regional Director may assume these in favor of the charge, and the district court should sustain him if his choice is within range of rationality." *Danielson v. Joint Board of Coat, Suit & Allied Garment Workers' Union,* 2 Cir., 1974, 494 F.2d 1230, 1245; *Kaynard v. Mego Corp.,* 2 Cir., 1980, 633 F.2d 1026, 1031.

■ However, when the Board simply has discretion under general section 10(j), we believe the whole panoply of discretion-

ary issues with respect to granting preliminary relief must be addressed by the court. *Mego,* ante, 633 F.2d at 1033; *McLeod v. General Electric Co.,* 2 Cir., 1966, 366 F.2d 847, 849–50, *vacated as moot,* 385 U.S. 533, 87 S.Ct. 637, 17 L.Ed.2d 588. This is the ordinary statutory principle unless a congressional purpose to the contrary clearly appears. *Hecht Co. v. Bowles,* 1944, 321 U.S. 321, 64 S.Ct. 587, 88 L.Ed. 754.[1] Otherwise the court is but a rubber stamp for the Director. Here it cannot be so simple to accept blindly the Regional Director's finding of a reasonable likelihood of success because weighing all the issues may well require a finding of the degree of the likelihood. There seems, in fact, a special reason for such overall weighing, section 10(j) being in derogation of the Norris-LaGuardia Act's prohibition of injunctions in labor disputes. 29 U.S.C. §§ 101–115; *Mego,* ante, 633 F.2d at 1033. The Board's claim of a "strong Congressional policy in favor of temporary injunctions" is obviously accurate with respect to section 10(*l*). We do not find it so with respect to section 10(j).

■ Nor do we accept the Board's argument in its opening brief that because section 10(h) of the Act specifically states that Norris-LaGuardia was not to stand in the way of temporary relief, "just and proper" considerations are not involved in section 10(j). If this were so, the Board would automatically be entitled to an injunction every time it could fairly show a chance of success. In its reply brief the Board backs water with full throttle on this point, and goes to great length to show the rarity of its seeking section 10(j) relief. The balance of this opinion is predicated on the Board's acceptance of and adherence to that policy.

### Facts Revisited

Both from the fact that the court devoted five days to a trial hearing on the injunction, and from its extensive findings in favor of University without even mention of

---

1. The seeming remark to the contrary with respect to a section 10(j) case, *Fuchs v. Hood Industries, Inc.,* 1 Cir., 1979, 590 F.2d 395, at 397, relies only on section 10(*l*) authorities, was dictum only, and was made without adverting to the differences between the two sections.

conflicting testimony, it is apparent that the court regarded its duty to be to try the matter de novo and make its own findings without even deference to the Board. This was precisely contrary to the cases cited ante, and all other cases that we know of. On the matter of reasonable cause to believe that there had been unfair labor practices, the court could have but two questions; whether the Regional Director's position was fairly supported and, if so, for the purpose of overall weighing, how likely so. On a review of the record, we are satisfied that there was indeed a likelihood, and, moreover, that it was an extremely strong one.

An unfair labor practice exists if anti-union animus was a substantial or motivating factor in the discharge, and University fails to prove the discharge would have occurred absent such motivation. *Wright Line,* 251 N.L.R.B. 1093 (1980), *enforced,* 1 Cir., 1981, 662 F.2d 899, *upheld,* *NLRB v. Transportation Management Corp.,* —— U.S. ——, 103 S.Ct. 2469, 76 L.Ed.2d 667 (1983). On the record, there is substantial evidence, both circumstantial and direct, indicating that the discharge was motivated by union activity. The decision to subcontract was made with haste, and coincided with the appearance of union cards. The clincher was noted by the ALJ in his subsequent decision upholding the charges. We agree with University that this decision, coming after the court's, carries no independent weight in assessing whether the court erred, but it is appropriate to look to evidence the ALJ points to that was before the court, but of which the court failed to take note.[2] It was defendants' position that on September 15 the poor performance of their janitorial employees called for reconsideration of the subcontracting alternative, and Dean Hernandez was asked to present figures the next day on the savings involved. The document allegedly prepared and produced on the 16th, with 11 items in exact dollars, was not only far more detailed than necessary for the purpose, but one item of minor consequence was backed by an inventory of supplies on hand, itself of 10 items, down to the last half package of paper towels. While such an inventory would be needed once Caribe had agreed to take the supplies, the Board would hardly be unreasonable if it concluded that the document date was a meretricious attempt to bolster University's claim of having made a business decision before its admitted learning of the union on September 17.

We recognize that, on the clear record, there could well have been a sound and supportable business basis for contracting out the janitorial services quite apart from the union, and that University's antedating the exhibit was merely an unwise attempt to paint the lily.[3] However, a user of a faulty firearm must risk a backfire. Attaching even the mildest presumption to the Director's resolution of conflicting evidence causes us to conclude that the likelihood of Board success was great.

The rest is relatively down hill. As to irreparable harm, this was a discharge of the entire workforce in the face of unionization, far more serious in its ultimate consequences even if at some later date those employees who have not succeeded in getting other work they prefer are restored to their jobs, than a case where only a handful of selected organizers is involved. The union, without early relief, may well be done for. Measuring the injury to Caribe and its employees, the record is clear that they undertook the employment with full knowledge of the situation. *Cf. NLRB v. Remington Rand, Inc.,* 2 Cir., 1938, 94 F.2d 862, 871 (L. Hand, J.) ("[I]t is probably true today that most men taking jobs so made vacant, realize from the outset how tenuous is their hold."). If they underestimated their risk, that is not a reason for denying

2. It is quite possible that additional evidence was produced before the ALJ. We accordingly disregard the ALJ's findings, and look solely to the district court record. Whether we should be moved by the ALJ's reasoning process, as argued by the Board, is a matter we need not reach.

3. Erroneously often said, "gild," but see, "To gild refined gold, to paint the lily...." W. Shakespeare, King John, IV, ii, 11.

relief where the likelihood of success is great. As to the public interest, again this would seem high in view of the numbers involved.

█ We deal, finally, with the concept of laches and delay. The court was of the view that since judicial relief was not sought until four months had passed, the special benefits that might have accrued from a more speedy restoration were largely lost. We agree that they might have become less, but to charge this against relief altogether would be too great a reaction. A busy administrative agency cannot operate overnight.[4] The very fact that it must exercise discretion, and that its decision is entitled to presumptive weight, cases ante, indicate that it should have time to investigate and deliberate. While it does seem perhaps unnecessarily long, we must reject the court's reliance on the four months delay.

█ A more serious factor is that we are now, perforce, talking about fourteen months delay. This is regrettable, and, more than likely, will greatly diminish the curative effect of the relief. Our obligation is to review the decision of the district court. If we were to consider this further delay, any undeserving beneficiary of a court's refusal to enjoin could hold fast and win above, even though he should not have won below, by a sort of automatic mootness. We cannot accept this result.

The judgment of the district court is reversed, and it is ordered that the injunction requested should issue.

---

4. *Cf.* section 10(j) with section 10(*l*), which    later requires the Board to drop all else.