Rosemary PYE, Regional Director of the First Region of the National Labor Relations Board, For and on Behalf of the NATIONAL LABOR RELATIONS BOARD, Petitioner,

v.

TEAMSTERS LOCAL UNION NO. 122, INTERNATIONAL BROTHERHOOD OF TEAMSTERS, AFL–CIO, Respondent.

Civ. A. No. 94–12379 JLT.

United States District Court, D. Massachusetts.

Jan. 30, 1995.

Kevin J. Murray, N.L.R.B., Boston, MA, for plaintiff Rosemary Pye, Regional Director of The First Region of The National Labor Relations Board, For and On Behalf of The National Labor Relations Board.

Stephen R. Domesick, Boston, MA, for defendant Teamsters Local Union No. 122, International Brotherhood of Teamsters, AFL–CIO.

## MEMORANDUM

TAURO, Chief Judge.

The Regional Director of the National Labor Relations Board (the "Regional Director") petitions the district court to enjoin actions by the Respondent, Teamsters Local Union No. 122 (the "Union"). The issue arises from the Union's actions directed at local beer and liquor retailers. The Regional Director contends that such actions amount to a violation of the National Labor Relations Act's (the "Act") prohibition against secondary boycotts.

Presently before the court is the Regional Director's petition for a preliminary injunction.

## I.

### Background

The Union represents workers at various distributors in the region. It is presently involved in a labor dispute with August A. Busch & Sons ("Busch"), an unrelated wholesaler. The details of the disagreement, as relevant to the instant petition, involve Busch's desire to do away with the seniority system and to allow retailers to pick up goods directly at their warehouse.

On November 17, 1994, the Union organized a demonstration at Kappy's Liquors, located at Wellington Circle in Medford, Massachusetts. Kappy's is one of the area's largest beer, wine and liquor retailers. The Union members gathered in a parking lot across the street from Kappy's. According to the Regional Director approximately 85–100 members then proceeded *en masse* to the store.[1] For the next forty-five minutes, the Union's cars filled almost all spots in the parking lot.

The Union members entered the store and participated in what the Union has dubbed "affinity group shopping". That is, members of the Union milled about and created long lines and congestion in the store. They purchased only small ticket items, such as bags of chips, single cans of beer, lottery tickets, etc. Moreover, these purchases were usually made with $20 bills. The affidavit from Kappy's store manager, Mark Stuart, states that the Union members were continuously in line at the store from approximately 5:15 to 5:45 p.m. He further alleges that members routinely made one purchase, left the store and re-entered to make another purchase. This demonstration was repeated at least twice at other area retailers.[2]

During the demonstration, Kappy's manager approached Jack Murphy, the Union's Secretary–Treasurer, and asked what was going on. Murphy insisted that the members were just shopping and that when they made their purchases they would leave the store. Additionally, however, he informed the manager of the Union's grievance with Busch, specifically that Busch wanted to end the seniority system and to allow direct customer pick-ups at the warehouse.

The next day Busch filed a complaint with the Regional Office of the National Labor

---

1. The Union contends that only 60–70 members participated in the demonstration.

2. The Union estimates that "hundreds of dollars" were spent by the members. Although they did not keep receipts, they did video tape the shopping trip. The Union saved the receipts from their demonstrations at Wollaston Wine and Price Costco. At Wollaston Wine about one hundred members of the Union spent approximately $450. At Price Costco, about forty five members spent $175.

Relations Board (the "Board").[3] The complaint asserted that the Union's actions were intended to coerce Kappy's and the other stores to stop doing business with Busch.

The Regional Director determined that there were reasonable grounds to believe that the Union's actions constituted a violation of the Act's prohibition against secondary boycotts. Act § 8(b), codified at 29 U.S.C. § 158(b)(4)(ii)(B). The Regional Director began the administrative process to adjudicate the merits of the dispute. Pursuant to the Congressional mandate, Act § 10(l), codified at 29 U.S.C. § 160(l), the Regional Director petitioned this court for a preliminary injunction. Further, the Regional Director contends that the affidavits and admissions by the Union show that there is no need for an evidentiary hearing and, therefore, the injunction can issue on the petition, affidavits and exhibits.

## II.

### Analysis

The determination of whether affinity group shopping[4] constitutes a violation of the Act is a case of first impression. Neither party has cited any cases on point.

 The relevant First Circuit case law stems from two decisions written by Judge Aldrich, *Union de Tronquistas de Puerto Rico, Local 901 v. Arlook*, 586 F.2d 872 (1st Cir.1978) ("*Local 901*"), and *Maram v. Univ-ersidad Interamericana de Puerto Rico, Inc.*, 722 F.2d 953 (1st Cir.1983) ("*Maram*"). The district court's role in this type of labor

dispute is severely limited. *Local 901*, 586 F.2d at 876 ("More significant is the limited function of the district court."). The court is not called upon to decide the merits of the case. This court does not have jurisdiction to decide whether affinity group shopping is a violation of the Act. That determination is reserved exclusively for the Board. *NLRB v. Denver Bldg. & Const. Trades Council*, 341 U.S. 675, 681–83, 71 S.Ct. 943, 948–49, 95 L.Ed. 1284 (1951); *Walsh v. Int'l Longshoremen's Assoc.*, 630 F.2d 864 (1st Cir.1980).

The Union has attempted to procure a more thorough review of the merits by noting that the Board, in all likelihood, will not rule on this issue for over a year. That does not change this court's limited role. One of the parties must bear the burden of the delay. Considering the Congressional attitude towards this issue, *see* 29 U.S.C. § 160(l) ("the preliminary investigation of [a § 10(l)] charge shall be made forthwith and given priority over all other cases except cases of like character...."), as interpreted by the First Circuit, *see Local 901* and *Maram*, it appears that the Union, rather than the Regional Director, must be frustrated during the intervening period.

### A. The Test for a § 10(l) Injunction.

 Contrary to the Union's position, the law of the First Circuit places almost full discretion with the Regional Director. In *Local 901*, the First Circuit found that when the Regional Director believes a union's actions to constitute a violation of § 10(l), she must apply to enjoin the practice.[5] This

---

3. Kappy's did not file a complaint.

4. Although the Union uses this label as if it were a term of art, the court notes that it has not found any other reference to such. Should the term have some conventional application of which the court is not aware, it cautions that this history is not relevant to the following determination. The court will proceed with this label, yet records its hesitation that by adopting the term it lends legitimacy and acceptance to the practice.

5. This mandatory duty can be contrasted with the Regional Director's discretion under § 10(j). § 10(l) applies to violations by the unions. § 10(j), on the other hand, applies to violations by management. § 10(l), as already noted,

mandates the Regional Director to apply for a preliminary injunction if she believes she has reasonable grounds to conclude that the union has violated the Act. The language of § 10(j), however, leaves the ultimate decision of whether to apply for an injunction to the Regional Director. *See Maram*, 722 F.2d at 957–58.

The Union argues that the district court's review of a § 10(l) petition should, therefore, be more thorough because the circumstances of the case did not receive a discretionary review by the Regional Director. The First Circuit has held otherwise. It wrote in *Maram* that with regard to the court's level of review under the two sections, "Congress intended the court's approach to differ *in the same manner as the Board's.*" *Maram*, 722 F.2d at 958. If the Board has less, or no discretion under § 10(l),

mandate has been interpreted as Congress' determination that such unfair labor practices "pose so substantial a threat to the free flow of commerce." *Local 901*, 586 F.2d at 876. In this regard, the First Circuit has held that *"the Regional Director faces a relatively insubstantial burden of proof." Id.* (emphasis added).

■ The traditional test for equitable relief, i.e., likelihood of success on the merits, irreparable injury, etc., has been lessened. "The special importance that Congress attaches to section 10($l$) offenses indicates here ... a *strong presumption of irreparable harm,* with *the balance in favor of the charging party,* and that the public interest favors the injunction." *Maram,* 722 F.2d at 958.

■ *Local 901* outlined a new three prong test: 1) "the court must determine whether the Regional Director has reasonable cause to believe that the elements of an unfair labor practice are present;" 2) "[t]he court must conclude that the legal theories relied upon by the Director are not without substance;" and 3) the court "must find that temporary injunctive relief is 'just and proper' in terms of effectuating the purposes of the Act." *Local 901,* 586 F.2d at 876.

### B. *Analysis of the Test for § 10(l) Injunctive Relief.*

Only the first element of the test has received substantial elaboration. The district court must find that the Regional Director has reasonable grounds to believe that the elements of an unfair labor practice are present. In this case, that amounts to reasonable grounds for believing that the Union is attempting to threaten, coerce or force retail stores to stop doing business with Busch. *See* 29 U.S.C. § 158(b)(4)(ii)(B).

The First Circuit has developed an extremely deferential standard of review for the district court to apply. With regard to the Regional Director's required finding of "reasonable grounds" the court wrote "the Director need only show *the existence of credible evidence,* even if disputed, together with reasonable inferences which support his conclusions." *Id.* "Further, when 'reason-

therefore, the district court must also have less

able cause to believe' turns on disputed issues of fact, the Regional Director may assume these in favor of the charge, and *the district court should sustain him if his choice is within the range of rationality." Maram,* 722 F.2d at 958.

■ The court has not found case law elaborating on the application of the second prong. The court believes, however, that its approach to this factor should continue with the same deference as the first. The First Circuit's discussion on the first prong, detailed above, focuses on the factual support for the Regional Director's decision. Determination of "reasonable cause to believe a violation occurred", however, inherently involves application of some legal theory, i.e., to determine whether the facts constitute a violation of the Act. To this extent, the second prong's scrutiny of the legal theory relied upon by the Regional Director is, in some measure, subsumed into the first. The district court's scrutiny under the second prong, therefore, should follow by the same standard as its scrutiny under the first prong, and should be highly deferential.

As to the third prong, the First Circuit wrote, "the court is concerned principally, not with the protection of private interests from irreparable injury, but rather with effectuating the policies of the Act." *Local 901,* 586 F.2d at 878. It further explains, "a section 10($l$) injunction may be just and proper *where necessary to preserve the status quo* so that the Board's ultimate decision will not be rendered moot by intervening events, or *where necessary to prevent disruptions in the flow of commerce or future unfair labor practices." Id.* (emphasis added).

### C. *Application of the Test to the Facts of the Case.*

■ Applying the facts of the instant case to the first prong, reasonable cause, there is little doubt that the Regional Director has met her burden. Although, there are minor disputes on issues of fact, such as how many people were in the store and how much money was spent, the court is supposed to draw

or no discretion.

all reasonable inferences in favor of the Regional Director. Regardless, there is no dispute that the 60–80 Union members entered the store, created long lines and repeatedly purchased small items with large bills.

The court finds that it is reasonable to interpret this action as sending a message to the retail store that the Union has the ability to interfere with the working of their business at any time. Add to this the fact that the retailer was informed that they were directly implicated by one of the Union's disputes with Busch—whether the retailers could pick up directly from the warehouse. The intent of the Union could reasonably be interpreted as sending a message to Kappy's, one of the area's largest retailers, not to get involved with Busch in this manner.

Although the Union is literally correct when it argues that its members were merely shopping, it can not contend that eighty members arriving at the same store was a coincidence. In fact, the affidavit from Jack Murphy admits that the members were organized and directed by the Union.

Whereas the retailers are probably pleased with the few hundred dollars of sales, the court believes that this does not dull the impact of the practice. In the regular course of events, one would expect eighty customers to spend more than four dollars each. More important is the impact the large crowds can and did have on other customers. The affidavit of Kappy's manager stated the he observed at least one customer exit the long lines and leave without completing her purchase. Further, a retail store would experience great inconvenience as customers repeatedly purchase items with large bills, thereby continually depleting the store's available change. The ease with which the union members could increase their harassment at the store is apparent.[6]

The court now turns its attention to the second prong, to evaluate the Regional Director's legal theory. The Union's brief attempted to paint its actions as non-picketing communications aimed at consumers. Such activity is protected, and not a violation of the Act. *De Bartolo v. Florida Gulf Coast Bldg. & Constr. Trades Council*, 485 U.S. 568, 108 S.Ct. 1392, 99 L.Ed.2d 645 (1988). The Union, however, mischaracterizes both its actions and the applicable law.

In its brief, the Union tries to limit secondary boycott violations to actions involving "picketing". (Def.Opp.Mem. at 9, "Congress was only concerned with 'barring threats ... carried out by picketing.... Congressman Griffin stated that the bill covered boycotts carried out by picketing neutrals....") This characterization, however, stretches the cases on which they rely.

Contrary to the Union's insinuation, *De Bartolo* and *NLRB v. Servette*, 377 U.S. 46, 84 S.Ct. 1098, 12 L.Ed.2d 121 (1964), also relied on by the Union, do not hold that picketing is a necessary element of a secondary boycott. *De Bartolo* clearly states *"among the concerns* of the proponents of the provision barring threats ... was consumer boycotts of neutral employers carried out by picketing." *Id.* 485 U.S. at 584, 108 S.Ct. at 1402 (emphasis added). The language of the Act itself does not attempt to define a secondary boycott in any precise manner and certainly does place "picketing" on a special plane. *De Bartolo*'s use of the word "picket" was merely to contrast with handbilling and other accepted forms of pressuring consumers or secondary companies to cease using the primary company's products.[7]

---

**6.** The fact that Kappy's did not file a complaint with the Board is irrelevant. Understandably, a third party might not want to provoke either side in the labor dispute. Moreover, Busch is the real party in interest, as it must concern itself with losing Kappy's business.

**7.** In *Servette*, for instance, the union asked the supermarket managers not to carry goods from a particular producer and told them that if they did, the union would pass out handbills to consumers asking them to boycott the producer.

377 U.S. at 47, 84 S.Ct. at 1100. The threat of handbilling was seen as no threat at all, because this action is specifically protected by the Act. *Id.* at 57, 84 S.Ct. at 1105. The *requests* made to the market managers were also found not to violate the Act, because they were not threats against the store. I.e., the union did not say, "stop carrying X's products or we'll shut you down too." It is this added threat, apparent in the Union's actions, that supports the Regional Director's conclusion.

To be fair to the Union, their present actions are quite innocent compared to the practices engaged in by unions in the cited cases. Those involve injunctions being issued when crowds of union members blocked entrances or stood outside a hotel yelling at "scabs" or threatened managers. *See Mine Workers (New Beckley Mining)*, 304 NLRB 71, 72, 1991 WL 163077 (1991). The Act, however, prohibits actions to "threaten, coerce, or restrain." 29 U.S.C. § 158(b)(ii). Nothing mandates that these actions be of a violent nature. Coercion can take many forms and is often most effective when it is very subtle.

The Union also attempted to justify its actions as "efforts to communicate to the public and consumers by means other than picketing, its dispute with an employer." (Def.Opp.Mem. at 8). The Union's actions, however, went beyond mere efforts to communicate.

Some of the members were stationed outside of Kappy's with signs visible to traffic. This is fine. Inside the store, however, the Union maintains that there were few, if any, customers other than its own members. More importantly, the Union maintains that its members were merely shopping, and that the only factor differentiating its members from ordinary shoppers was their affiliation with the Union. The court fails to see how this activity communicates any message to the public. As the Union describes the scene, any customers in the store would have observed a large group of people making small purchases. This communicates nothing. There are no allegations that handbills were distributed or that customers were otherwise apprised of the Union's dispute with Busch. It is the opinion of the court, therefore, that the actions must be seen as sending a message to Kappy's.

On that note, if the Union intended to inform Kappy's of its grievance with Busch, this was a questionable and impractical method. For instance, in *Severette*, discussed above, the union representatives merely spoke with the retail store and said they did not want the store to deal with the distributor. *Servette*, 377 U.S. at 47, 84 S.Ct. at 1100. In the instant case, the Union made a concerted effort to make Kappy's aware of the Union's ability to enter the store and, in effect, shut them down. Moreover, it is uncontested that the Union representative informed Kappy's manager that one of its disputes with Busch involved Busch's desire to let retailers pick up directly from the warehouse. This brings Kappy's directly into the dispute.[8]

The court finds, therefore, that the Regional Director had reasonable grounds to believe that the Union's actions were in violation of the Act and that the legal theories relied upon by the Regional Director are not without substance. The Union's actions were directed at Kappy's and could have the effect of altering the retail store's relationship with Busch. The alternative motives suggested by the Union are too indirect and amorphous. The Regional Director's determination is, therefore, reasonable.

■ The final prong of the *Local 901* test is that the injunction must be "just and proper." The First Circuit stated, "[a] section 10(*l*) injunction may be just and proper [1] where necessary to preserve the status quo so that the Board's ultimate decision will not be rendered moot by intervening events, or [2] where necessary to prevent disruptions in the flow of commerce and future unfair labor practices." *Local 901*, 586 F.2d at 878.

The Regional Director has not put forth sufficient evidence to satisfy the first test. There has been no allegation of irreparable damage flowing to either party as a result of this action.[9] Further, at the hearing, the Union alleged, and the Regional Director did

---

**8.** At the hearing the Union made one final argument. It claimed that its actions were meant to send a message to Busch. Apparently, the Union had just successfully completed a long-standing dispute with another area wholesaler. It claimed that its actions at Kappy's was to make Busch aware that it would pursue its new dispute with the same fervor. The court finds little merit in this argument. It is difficult to see how such a non-public demonstration would send a message to Busch.

**9.** Finding of irreparable damage is not a precursor of allowing this injunction. *See Maram*, 722 F.2d at 958.

not dispute, that this type of activity has taken place many times in the past. Little will occur in the interim that will render moot the subsequent decision by the Board.

The second factor sets up a more flexible standard. In making a determination of whether the Union's actions may cause disruptions in the flow of commerce, the court returns to the language of *Local 901*, stating that "[t]he special importance that Congress attaches to section 10(*l*) offenses indicates here . . . a strong presumption of irreparable harm, with the balance in favor of the charging party." *Local 901*, 586 F.2d at 876. Of course, the mere fact that the Regional Director moved for an injunction cannot be sufficient to deem the requested relief "just and proper." If this were so, the third factor would be mere pretextual language. Moreover, too much discretion would turn the district court into a rubber stamp.

The court, however, finds that an injunction would be just and proper in this instance. At the hearing the Union stated that it intends to continue with these demonstrations. Any harm caused to the third party or to the flow of commerce, therefore, is ongoing. Additionally, the Union has not identified any harm which would befall it if the injunction were to issue. They would still be able to pass out handbills and hold signs at various retail locations, as long as these actions are directed at Busch and not the retailers themselves.

Finally, the language in *Local 901* reads, literally, "a section 10(*l*) injunction *may* be proper. . . ." It does not say that a section 10(*l*) injunction *is only* proper when those two elements exist. When this court is deciding whether to grant an injunction in these instances, the overriding concern is "effectuating the purposes of the Act." *Local 901*, 586 F.2d at 876. Although on the surface, the demonstrations here are of a fairly innocent nature, the court cannot escape Congress' goal of protecting innocent third parties from become embroiled in labor disputes. The impact on the retail stores is rather indirect. This, however, is likely to be the case in many similar actions. Not all boycotts and illegal labor practices rise to levels that scream for relief. The court must be cautious, however, and remember that from the standpoint of an innocent third party to a labor dispute, any threats and coercion in the way it manages its business is unfair and must be guarded against.

The court finds, therefore, that the Regional Director has reasonable grounds to believe that a violation of the Act has occurred and that an injunction against the offending conduct is just and proper. It reiterates, however, that this is simply an interlocutory decision pending final adjudication by the Board. The law of the First Circuit set forth a low standard for Regional Director to meet in order to acquire the requested relief. This court merely finds that the Regional Director has met this standard.

### D. *Is the Respondent Entitled to an Evidentiary Hearing?*

Petitioner argues that this injunction can be granted on the weight of the petition, affidavits and exhibits. Respondents, however, argue that they are entitled to an evidentiary hearing. The Act states that "[u]pon filing of any such petition the courts shall cause notice thereof to be served . . . and such person, including the charging party, shall be given an opportunity to appear by counsel and *present any relevant testimony*." 29 U.S.C. § 160(*l*) (emphasis added).

Petitioner's argument is, in effect, that there is no other relevant testimony to be presented. The court agrees. Based simply on the affidavits of the Union representative and the admissions made by the Union at the hearing, all of the relevant facts are admitted. Although there are some disputes as to numbers of people involved, these are not material issues. There is nothing more that this court needs to know. It is now presented with a question of law—whether the facts support the issuance of an injunction. As noted above, this court is of the opinion that, under the deferential standard set forth by the First Circuit, the law supports the injunction.

The court finds, therefore, that an evidentiary hearing would be superfluous and would not bring forth any relevant evidence.

## III.

### *Conclusion*

For the foregoing reasons, the Petitioner's Petition for Injunction under Section 10(*l*) of the Act is ALLOWED.