UNITED STATES COURT OF APPEALS UNITED STATES COURT OF APPEALS
FOR THE FIRST CIRCUIT FOR THE FIRST CIRCUIT



No. 95-1331

ROSEMARY PYE, REGIONAL DIRECTOR, ETC.,

Petitioner, Appellee,

v.

TEAMSTERS LOCAL UNION NO. 122,

Respondent, Appellant.



APPEAL FROM THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF MASSACHUSETTS

[Hon. Joseph L. Tauro, U.S. District Judge] 



Before

Selya and Cyr, Circuit Judges, 

and Schwarzer,* Senior District Judge. 



Stephen R. Domesick for appellant 
Corinna L. Metcalf, Deputy Assistant General Counsel, with 
whom Frederick Feinstein, General Counsel, Ellen A. Farrell, 
Assistant General Counsel, and Barry J. Kearney, Acting Assistant 
General Counsel, were on brief, for appellee.



August 8, 1995




*Of the Northern District of California, sitting by designation.

SELYA, Circuit Judge. This appeal features an SELYA, Circuit Judge. 

interlocutory injunction issued on the authority of section 10(l)

of the National Labor Relations Act (NLRA), barring a labor

union's innovative practice of conducting "group shop-ins" at

secondary businesses (retail liquor outlets) as an outgrowth of

its grievance with a primary employer (a beer distributor).1

After carefully considering the parties' positions in light of

the pertinent authorities, we affirm the district court's order

in all respects.

I. THE FACTS AND THE PROCEEDINGS BELOW I. THE FACTS AND THE PROCEEDINGS BELOW

The facts are set out in the district court's opinion,

see Pye v. Teamsters Local Union No. 122, 875 F. Supp. 921, 923- 

24 (D. Mass. 1995), and it would serve no useful purpose to

rehearse them here. We content ourselves with a decurtate

summary, presented in a manner that recognizes the statutory edge

 

1Section 10(l) provides in relevant part:

Whenever it is charged that any person has
engaged in an unfair labor practice [as
defined in other sections of the NLRA], the
preliminary investigation of such charge
shall be made forthwith . . . . If, after
such investigation, the officer or regional
attorney to whom the matter may be referred
has reasonable cause to believe such charge
is true and that a complaint should issue, he
shall, on behalf of the Board, petition any
[appropriate] United States district court .
. . for appropriate injunctive relief pending
the final adjudication of the Board with
respect to such matter.

29 U.S.C. 160(l) (1988). The same statute authorizes the
district court to grant such injunctive relief "as it deems just
and proper . . . ." Id. 

2

enjoyed by petitioner-appellee, the Regional Director of the

National Labor Relations Board (NLRB or Board), in connection

with the resolution of disputed factual issues and the inferences

that may be drawn therefrom.

In November of 1994, respondent-appellant Teamsters

Local Union No. 122 (the Union), then embroiled in a labor

dispute with August A. Busch & Co. of Massachusetts, Inc.

(Busch), organized three group shopping trips. During each

outing, Union members descended, in droves and in concert, upon a

designated retail establishment and engaged in multiple rounds of

penny-ante purchasing, buying small, inexpensive items such as

packs of chewing gum or bags of potato chips and paying for them

(more often than not) with bills of large denomination. The

sequelae were predictable: overcrowded parking lots, congested

aisles, long checkout lines, and an exodus of regular customers.

Although some of the group shoppers adorned themselves with Union

symbols, the record contains virtually no proof of objectively

expressive activity. More particularly, we can find no evidence

suggesting that the Union, through group shopping, made any

discernible attempt to communicate a defined message to the

public.2

The three shop-ins, each involving a different retailer

engaged in commerce, occurred at different locations in
 

2During one of the excursions some Union adherents remained
outside the store, holding banners aloft. The injunction issued
by the lower court does not affect that activity, and we consider
it irrelevant for the purpose of determining the issues sub 
judice. 

3

Massachusetts. The first incident transpired on November 17,

when a band of approximately 70 Union members invaded the

premises of Kappy's Liquors. The group shopping (which

respondent prefers to call "affinity group shopping" or

"associational shopping") persisted for some 45 minutes. The

record reflects that at least one customer, apparently

discouraged by the crush of Union members, left without

transacting any business. The second shop-in occurred on

November 23 at Wollaston Wine. This event also lasted about 45

minutes. Approximately 125 Union members participated. The

third incident took place on November 25 at the liquor department

of Price Costco, a discount house. It involved 50 or so Union

members. The record does not pinpoint its duration. All three

episodes began late in the afternoon (a prime time in the package

store trade), and the latter two incidents occurred on the days

before and after the Thanksgiving holiday (days that customarily

produce substantial sales for liquor retailers). The record

reveals that on at least two of the occasions store managers

complained to a Union official who was on the premises, deploring

the disruptive effects of the practice on their business. On the

third occasion, the store owner apparently took his concerns

directly to Busch.

Busch displayed little affinity for the Union's newly

contrived stratagem. It complained to the Regional Director who,

in turn, initiated an administrative adjudicatory process to

examine whether the group shopping constituted an unfair labor

4

practice prohibited by NLRA 8(b)(4)(ii)(B), 29 U.S.C. 

158(b)(4)(ii)(B) (1988). The Regional Director theorized that,

because the Union's actual labor dispute was with the primary

employer, Busch, section 8(b)(4)(ii)(B) expressly prohibited it

from trying to impair the relationships of secondary businesses

(the retail stores) with Busch. Resisting this line of reasoning

and denying any wrongdoing, the Union asseverated that these

shop-ins were efforts to publicize its grievance with Busch, and

were thus beyond the statute's proscriptive reach. The Union

also asseverated that, in the end, the group shopping actually

benefitted the retailers by generating hundreds of dollars in

sales.

The Regional Director refused to buy the Union's wares.

On December 1, she invoked section 10(l) and petitioned for

temporary injunctive relief in the federal district court,

asserting that she had reasonable cause to believe that the

associational shopping amounted to an illegal secondary boycott

because its real purpose was to force the retailers to cease

purchasing beverages from Busch. The district court, perceiving

no need for an evidentiary hearing,3 found for the Regional
 

3Section 10(l) directs that affected parties "shall be given
an opportunity to appear by counsel and present any relevant
testimony." Here, however, the district court found that the
papers were sufficient. See Pye, 875 F. Supp. at 928 ("Based 
simply on the affidavits of the Union representative and the
admissions made by the Union . . ., all of the relevant facts are
admitted."). Although the Union's briefs appear critical of this
ruling, the Union has not appealed from it, and we decline to
address it further. See Ryan v. Royal Ins. Co. of Am., 916 F.2d 
731, 734 (1st Cir. 1990) ("It is settled in this circuit that
issues adverted to on appeal in a perfunctory manner,

5

Director. See Pye, 875 F. Supp. at 925-28. In due course, the 

court entered a decree that constitutes the actual injunction.

Its key provisions are set out in the margin.4 This appeal

ensued.

II. THE LAW AND ITS APPLICATION II. THE LAW AND ITS APPLICATION

The so-called labor injunction has been among the most

controversial landmarks dotting the historical landscape of

American labor law. See generally Felix Frankfurter & Nathan 

Greene, The Labor Injunction (1930); Clarence E. Bonnet, The 

Origin of the Labor Injunction, 5 S. Cal. L. Rev. 105 (1931); 

Eileen Silverstein, Collective Action, Property Rights, and Law 
 

unaccompanied by some developed argumentation, are deemed to have
been abandoned.").

4The decree prohibits the Union, and various categories of
individuals associated with it, from:

(a) organizing and conducting mass
demonstrations, including affinity group
shopping, store occupations, occupying
parking lots, picketing or other mass
activity, where an object thereof is to force
or require Kappy's Liquors, Wollaston Wine,
Price Costco or any other person to cease
using, selling, handling, transporting or
otherwise dealing in the products of or to
cease doing business with August A. Busch &
Co. of Massachusetts, Inc.
(b) in any manner or by any means,
threatening, coercing or restraining Kappy's
Liquors, Wollaston Wine, Price Costco or any
other person engaged in commerce or in an
industry affecting commerce where an object
thereof is to force or require Kappy,s
Liquors, Wollaston Wine, Price Costco or any
other person to cease using, selling,
handling, transporting or otherwise dealing
in the products of or to cease doing business
with August A. Busch & Co. of Massachusetts,
Inc.

6

Reform: The Story of the Labor Injunction, 11 Hofstra Lab. L.J. 

97 (1993). The section 10(l) injunction is a special species of

the labor injunction,5 designed to halt, inter alia, secondary 

activity that the Regional Director believes is in violation of

NLRA 8(b)(4)(ii)(B) until the NLRB can consider the charges and

reach a decision on the merits. The special nature of the

section 10(l) injunction informs our analysis of the case.

A. Standards of Review. A. Standards of Review. 

The standards of review applicable to appeals from

district court decisions arising under section 10(l), whether

granting or denying the requested relief, are extremely

deferential. We review the lower court's factual findings for

clear error; we review its rulings of law de novo; and we review

its ultimate conclusion, authorizing or withholding the

requested relief, for abuse of discretion. See Hoeber v. Local 

30, United Slate, Tile & Composition Roofers, Etc., 939 F.2d 118, 

123 (3d Cir. 1991); Union de Tronquistas de P.R., Local 901 v. 

Arlook, 586 F.2d 872, 876 (1st Cir. 1978); see also Asseo v. 

Centro Medico del Turabo, Inc., 900 F.2d 445, 450 (1st Cir. 1990) 

(explicating identical standards under a corollary relief

provision, NLRA 10(j), 29 U.S.C. 160(j)); Asseo v. Pan Am. 

Grain Co., 805 F.2d 23, 25 (1st Cir. 1986) (same); see generally 

George Schatzki, Some Observations About the Standards Applied to 
 

5Inasmuch as section 10(l) is aimed almost exclusively at
unions, it represents a marked departure from the anti-injunction
ethos embodied in the Norris-LaGuardia Act, Pub. L. No. 72-65, 47
Stat. 70 (1932) (codified as amended and repealed in part at 29
U.S.C. 101-115 (1988)).

7

Labor Injunction Litigation Under Sections 10(j) and 10(l) of the 

National Labor Relations Act, 59 Ind. L.J. 565, 575-76 (1983) 

(noting these standards of review and the striking pattern of

appellate deference under section 10(l)).

Our level of deference is heightened because we are

perched on the second tier of review vis-a-vis the Regional 

Director's assertion of reasonable cause. The district court

occupies the first tier, and just as that court must itself defer

in significant measure to the evaluative judgments of the

Regional Director, see, e.g., Union de Tronquistas, 586 F.2d at 

876, so, too, must we defer to the district court.6 Thus, in

this doubly sheltered enclave, the judicial task is generally

confined to weeding out wholly arbitrary or thoroughly

insupportable petitions for relief. See Squillacote v. Graphic 

Arts Int'l Union, 540 F.2d 853, 859 (7th Cir. 1976). 

Of course, an important reason undergirding the
 

6This layered deference district court to Regional
Director and appellate court to district court has parallels
elsewhere in the law. For example, we have encountered a
virtually identical design when reviewing district court
assessments of consent decrees under certain environmental
statutes. See, e.g., United States v. DiBiase, 45 F.3d 541, 543- 
44 (1st Cir. 1995); United States v. Cannons Eng'g Corp., 899 
F.2d 79, 84 (1st Cir. 1990). In such circumstances, we have been
impelled to note that "by the time [such] consent decrees reach
this court, they are encased in a double layer of swaddling,"
DiBiase, 45 F.3d at 544 (internal quotation marks omitted), 
reflecting not only the district court's justifiable mandate to
defer to administrative expertise, but also the appellate court's
mandate to defer to the trial court's factfinding expertise and
its informed discretion. In turn, this "doubly required
deference district court to agency and appellate court to
district court places a heavy burden on those who purpose to
upset a trial judge's approval of a consent decree." Cannons, 
899 F.2d at 84. The burden is equally heavy here.

8

deferential standard of judicial review in section 10(l) cases is

that neither the district court nor the court of appeals is

adjudicating the merits, as such, to determine whether an unfair

labor practice occurred. To the contrary, the courts' role at

this stage is merely to supply a stopgap, that is, to palliate a

likely violation detected by the Regional Director "pending the

final adjudication of the Board with respect to such matter." 29

U.S.C. 160(l). Consequently, a decision in a section 10(l)

proceeding is circumscribed in both time and scope, and any

relief that may be granted is effective only while the related

unfair labor practice charge is pending before the NLRB.7 See 

Sears, Roebuck & Co. v. Carpet, Linoleum, Soft Tile & Resilient 

Floor Covering Layers, 397 U.S. 655, 658-59 (1970) (per curiam); 

Walsh v. International Longshoremen's Ass'n, 630 F.2d 864, 868 

(1st Cir. 1980). Given the design of the statute, the agency

expertise involved, and the two-tiered structure of review, a

party appealing from an order granting or refusing a temporary

injunction pursuant to section 10(l) confronts the sobering

prospect that most battles over the appropriateness of such
 

7Still another reason to accord a significant degree of
deference to the claims of the Regional Director is the strength
of the congressional mandate. See Union de Tronquistas, 586 F.2d 
at 876. Under the law, once the Regional Director has reasonable
cause to believe that a Union's activity falls within the
proscription of section 10(l), she "shall . . . petition . . . 
for appropriate injunctive relief . . . ." 29 U.S.C. 160(l)
(emphasis supplied). This is in stark contrast to section 10(j),
which grants discretion to pursue injunctions against employers
under specified circumstances. See Miller v. California Pac. 
Medical Ctr., 19 F.3d 449, 456 (9th Cir. 1994) (en banc) 
(recognizing the dichotomy); see generally Schatzki, supra, at 
568-71 (comparing and contrasting the provisions).

9

redress will be won or lost long before appellate review takes

hold.

B. Standard of Analysis. B. Standard of Analysis. 

Congruent with these deferential standards of review,

the analytic path to be traversed in a section 10(l) case is

narrower than that typically travelled in the course of reviewing

the grant or denial of preliminary injunctive relief. Indeed,

"in a section 10(l) case the judicial inquiry is only, or at

least primarily, whether there is reasonable cause to believe a

section 10(l) offense has been committed." Maram v. Universidad 

Interamericana de P.R., Inc., 722 F.2d 953, 958 (1st Cir. 1983). 

Other factors that ordinarily inform district court actions in

respect to temporary injunctions are, at most, of secondary

interest. See id. (concluding that "the special importance that 

Congress attaches to section 10(l) offenses indicates . . . a

strong presumption of irreparable harm, with the balance in favor

of the charging party, and that the public interest favors the

injunction"). Hence, the method of analysis that governs

appellate review of the propriety and scope of a section 10(l)

injunction is best described as follows:

First, the court must determine whether the
Regional Director has reasonable cause to
believe that the elements of an unfair labor
practice are present. In this regard, the
Director need only show the existence of
credible evidence, even if disputed, together
with reasonable inferences, which support
[her] conclusions. . . . Second, the court
must conclude that the legal theories relied
upon by the Director are not without

10

substance. Finally, it must find that
temporary injunctive relief is "just and
proper" in terms of effectuating the purposes
of the Act.

Union de Tronquistas, 586 F.2d at 876 (citations omitted). 

Having stated the bareboned test, we next flesh out its

three constituent parts.

1. Reasonable Cause. The centerpiece of the required 1. Reasonable Cause. 

analysis is the supportability vel non of the Regional Director's 

determination that there is reasonable cause to believe that an

unfair labor practice has been, or is being, committed. The case

law reveals two principles, in particular, that demarcate the

meaning and the margins of this requirement.

First, the Regional Director's evidentiary burden,

whether measured quantitatively or qualitatively, is modest.

Although courts phrase this principle in different ways,

sometimes speaking in terms of the Regional Director's burden of

proof, see, e.g., Hirsch v. Building & Constr. Trades Council, 

530 F.2d 298, 302 (3d Cir. 1976) (characterizing burden as

"relatively insubstantial"), sometimes speaking in terms of the

quantum of proof, see, e.g., Gottfried v. Sheet Metal Workers' 

Int'l Ass'n, Etc., 927 F.2d 926, 927 (6th Cir. 1991) (requiring 

only that the Regional Director bring forth "some evidence" in

support of her petition), and sometimes speaking in terms of the

probative value of evidence as opposed to its raw quantity, see, 

e.g., Union de Tronquistas, 586 F.2d at 876 (requiring that the 

Regional Director "show the existence of credible evidence, . . .

together with reasonable inferences," to support her

11

conclusions), the thrust of the decided cases is uniform: the

Regional Director need not prove that the respondent has in fact

violated the NLRA, but, rather, she need only make a minimal

evidentiary showing of good reason to believe that the essential

elements of an unfair labor practice are in view.

The second principle that is germane to the reasonable

cause inquiry is that genuinely disputed issues of material fact

should be resolved at this early stage in favor of the Regional

Director's exposition. See Maram, 722 F.2d at 958; Union de 

Tronquistas, 586 F.2d at 876; Kaynard v. Mego Corp., 633 F.2d 

1026, 1031 (2d Cir. 1980). Put another way, in proceedings under

section 10(l) the Regional Director must be given the benefit of

every legitimate fact-based doubt. Thus, a reviewing court "need

not concern itself with resolving conflicting evidence if facts

exist which could support the [Regional Director's] theory of

liability." Fleischut v. Nixon Detroit Diesel, Inc., 859 F.2d 

26, 29 (6th Cir. 1988).

2. Legal Theory. The next segment of the tripartite 2. Legal Theory. 

analysis implicates the legal theory on which the Regional

Director relies. The requirement is straightforward: the

Regional Director's theory need not be irreproachable; it

suffices if it "is not without merit." Union de Tronquistas, 586 

F.2d at 877. In other words, the Regional Director need not

persuade the court then and there of her theory's ultimate

validity, but she must show that the theory is presentable. See 

Hirsch, 530 F.2d at 302 (explaining that the legal theory upon 

12

which the Regional Director proceeds must be "substantial and not

frivolous"); see also Hoeber, 939 F.2d at 123-24 (quoting Hirsch 

with approval); see generally 8 Theodore Kheel, Labor Law  

38.01[1], at 38-9 (1995).

3. Just and Proper. Finally, injunctive relief 3. Just and Proper. 

granted pursuant to section 10(l) must, by the terms of the

statute itself, be "just and proper." Both the purpose and the

contours of this imperative are relatively well-developed. "The

purpose of the 10(l) injunction is to preserve the status quo

in order that the ultimate decision of the Board would not be

negated or rendered moot by intervening events." Compton v. 

National Maritime Union of Am., 533 F.2d 1270, 1276 (1st Cir. 

1976). Thus, temporary injunctive relief, if otherwise

warranted, passes the "just and proper" test as long as it

comprises a reasonable means of ensuring the efficacy of the

Board's final order, or preserving the status quo, or permitting

administrative proceedings to go forward without undue hindrance,

or preventing unjustified interruption of the free flow of

commerce, or forestalling the repetition of unfair labor

practices. See, e.g., Hoeber, 939 F.2d at 122; Gottfried, 927 

F.2d at 927; Asseo, 900 F.2d at 455; Union de Tronquistas, 586 

F.2d at 878. In this sense, the purpose of the section 10(l)

injunction is simply a narrower, more specific expression of the

purpose underlying preliminary injunctions in general. See, 

e.g., CMM Cable Rep., Inc. v. Ocean Coast Props., Inc., 48 F.3d 

13

618, 620 (1st Cir. 1995) ("The purpose of a preliminary

injunction is to preserve the status quo, freezing an existing

situation so as to permit the [ultimate trier of the issues],

upon full adjudication of the case's merits, more effectively to

remedy discerned wrongs.").

Since a section 10(l) injunction "may enjoin only those

unlawful labor practices specified in the [NLRA]," Hendrix v. 

International Union of Operating Eng'rs, Local 571, 592 F.2d 437, 

445 (8th Cir. 1979), the form of the injunction must dovetail

with the statutory goals. However, less is often better than

more, and the relief granted should be narrowly tailored to that

which is reasonably necessary to stop mischief, prevent

additional harm, and ensure effective final relief. See 

Gottfried, 927 F.2d at 928; Potter v. Houston Gulf Coast Bldg. 

Trades Council, 482 F.2d 837, 841 (5th Cir. 1973). 

C. Applying the Standards. C. Applying the Standards. 

Applying these standards of review and analysis, we

conclude that the instant decree passes muster.

1. Reasonable Cause. The statutory proscription that 1. Reasonable Cause. 

triggered section 10(l) in this case, namely, section

8(b)(4)(ii)(B), makes it "an unfair labor practice for a labor

organization or its agents . . . to threaten, coerce, or restrain

any person engaged in commerce or in an industry affecting

commerce, where . . . an object thereof is . . . forcing or

requiring any person . . . to cease doing business with any other

person . . . ." The question at this step of the analysis,

14

therefore, reduces to the supportability of the district court's

finding that the Regional Director had reasonable cause to

believe (1) that the activity of group shopping might somehow

threaten, coerce, or restrain a retail liquor outlet, and (2)

that an object of the group shopping was to force or require such

secondary businesses to sever relations with Busch. We conclude

that this finding is not clearly erroneous.

First and foremost, it is reasonable to regard the

practice of group shopping as potentially coercive. The

character of the conduct including the use of all or virtually

all of a store's parking lot, the occupation of much of the

interior shopping area, the forbidding presence of a throng of

people acting in unison, and the fostering of long checkout lines

through repeated purchases of small items with large bills 

tends by its very nature to disrupt normal commercial activity

and, thus, to place economic pressure on a retail establishment

to appease the Union by, say, cutting back on dealings with the

primary employer.8 The Union counters that, even so, the
 

8The Union's insistence that the shop-ins actually generated
sales for the retailers is a red herring empirically erroneous,
conceptually incomplete, and legally irrelevant. For one thing,
sales limited to snacks and individual drinks during a prime
selling period scarcely seem economically beneficial when
compared to the retailer's opportunity costs, that is, the
displaced sale of liquor, wine, and other more profitable items.
See Pye, 875 F. Supp. at 926 ("In the regular course of events, 
one would expect eighty customers to spend more than four dollars
each."). Similarly, the Union's rodomontade utterly disregards
the potential long-term economic consequences of the shop-ins,
such as the easily envisionable loss of intimidated or frustrated
customers. For another thing, it is the secondary business, not
the Union, that should determine what is or is not in the
former's best economic interest. Here, the record strongly

15

evidence falls short. Insofar as this argument presumes that

moderately obstructive conduct by a union is not alone sufficient

either to trigger section 8(b)(4)(ii)(B) or to justify a section

10(l) injunction, we accept the presumption. See National 

Maritime Union of Am. v. NLRB, 367 F.2d 171, 176 (8th Cir. 1966), 

cert. denied, 386 U.S. 959 (1967). Because section 8(b)(4) 

ultimately proscribes objects rather than merely the means

adopted to accomplish them, the record must contain enough

evidence to permit a finding that the Union actually possessed

the statutorily proscribed object of forcing secondary

establishments to cease doing business with the primary employer.

We think that the Regional Director satisfied this

requirement here. To be sure, there is no smoking gun, no direct 

evidence of an avowed intention to influence the retailers'

commercial behavior. But a "union's `object' may be inferred

from its acts," New York Mailers' Union No. 6 v. NLRB, 316 F.2d 

371, 372 (D.C. Cir. 1963), and particularized evidence of

subjective intent is not essential for proof of a violation. See 

NLRB v. Erie Resistor Corp., 373 U.S. 221, 227 (1963); NRLB v. 

Denver Bldg. & Constr. Trades Council, 341 U.S. 675, 688-89 

(1951); Soft Drink Workers Union Local 812 v. NLRB, 657 F.2d 

1252, 1261-62 (D.C. Cir. 1980); Pickens-Bond Constr. Co. v. 

United Bhd. of Carpenters & Joiners of Am., Local 690, 586 F.2d 
 

suggests that the retailers themselves did not welcome the
Union's custom. Finally, whether or not economic harm actually
occurs as a result of a union's secondary activity is, in the
circumstances of this case, largely beside the point.

16

1234, 1241 (8th Cir. 1978); see also International Longshoremen's 

Ass'n v. Allied Int'l, Inc., 456 U.S. 212, 224 (1982) (confirming 

that a union "must take responsibility for the `foreseeable

consequences' of its conduct") (quoting NLRB v. Retail Store 

Employees Union, Local 1001, 447 U.S. 607, 614 n.9 (1980)). It 

follows that, if an unwholesome object can logically be inferred

from the nature of the conduct, evaluated in light of the

practical realities of a given situation, then direct evidence of

the object need not be produced. See, e.g., Local 357, Int'l 

Bhd. of Teamsters, Etc. v. NLRB, 365 U.S. 667, 675 (1961). 

Here, the facts permitted the Regional Director

rationally to infer an unlawful object on the Union's part. The

Union's conduct was undertaken in such a way, and at such times,

as to maximize its obstructiveness. And, moreover, this effect

can easily be viewed as primary and deliberate, not incidental

and accidental. Hence, the Regional Director could reasonably

have believed that the principal object of the shop-ins was to

force the secondary businesses to stop trading with the primary

employer. As the district court perspicaciously observed, the

group shop-ins can reasonably be interpreted as having been

designed to send a dual message to the retailers: first, "that

the Union has the ability to interfere with the working of their

business at any time," and second, that the retailers ought "not

to get involved with Busch" in the ongoing labor dispute by

picking up merchandise directly from Busch's warehouse. Pye, 875 

F. Supp. at 926.

17

The Union has a fallback position. Citing both Edward 

J. DeBartolo Corp. v. Florida Gulf Coast Bldg. & Constr. Trades 

Council, 485 U.S. 568 (1988), and the First Amendment, the Union 

hawks its right, specifically preserved by section 8(b)(4), to

publicize its grievance with a primary employer.9 Building on

this theme, the Union claims that the injunction is tantamount to

an impermissible content-based regulation because it prevents

activities that could affect the public's marketplace decisions

about what beer to purchase. While the Union's theory might

raise potentially interesting issues if anchored in the record,

see generally Lee Goldman, The First Amendment and Nonpicketing 

Labor Publicity Under Section 8(b)(4)(ii)(B) of the National 
 

9Section 8(b)(4) is hedged by two provisos. One declares
"[t]hat nothing contained in . . . clause (B) shall be construed
to make unlawful, where not otherwise unlawful, any primary
strike or primary picketing . . . ." The second proviso, on
which the Union relies here, is the so-called "publicity
proviso." It stipulates:

That for the purposes of this paragraph (4)
only, nothing contained in such paragraph
shall be construed to prohibit publicity,
other than picketing, for the purpose of
truthfully advising the public, including
consumers and members of a labor
organization, that a product or products are
produced by an employer with whom the labor
organization has a primary dispute and are
distributed by another employer, as long as
such publicity does not have an effect of
inducing any individual employed by any
person other than the primary employer in the
course of his employment to refuse to pick
up, deliver, or transport any goods, or not
to perform any services, at the establishment
of the employer engaged in such distribution
. . . . 

29 U.S.C. 158(b)(4) (1988).

18

Labor Relations Act, 36 Vand. L. Rev. 1469 (1983), it floats free 

of factual support and, therefore, need not concern us.

In the first place, we like the district court, see 

Pye, 875 F. Supp. at 927 remain unconvinced that the Union's 

affinity group shopping, under the circumstances recounted in the

record, can be deemed objectively expressive. At any rate, there

is little or no evidence to suggest that the Union's object in

mounting group shop-ins was related to publicity in any

meaningful sense, or that the participating Union members were

actually engaged in expressive activity. In turn, because the

group shopping was not a publicity-based appeal to consumers, the

principal cases cited by the Union which address the

constitutional and statutory status of such activity, DeBartolo 

included, are simply not relevant to the disposition of this

case.

In the second place, section 8(b)(4)(ii)(B) is in play

as long as forcing one person to stop doing business with another

is an object of the allegedly unlawful activity; the statute 

requires neither that the proscribed object be the exclusive

object nor even the primary object. See Denver Bldg. & Constr. 

Trades, 341 U.S. at 689; Local Union No. 25 v. NLRB, 831 F.2d 

1149, 1153 (1st Cir. 1987); Carpet, Linoleum, Soft Tile & 

Resilient Floor Covering Layers v. NLRB, 467 F.2d 392, 399 n.13 

(D.C. Cir. 1972). Thus, whatever mixed motives the Union

harbored are of considerably less import once an unlawful object

19

is discerned.10 This is especially true in the precincts

patrolled by section 10(l). Even if "[t]he claims of the Union

based on the first amendment to the Constitution and on the

`publicity proviso' . . . are not insubstantial," Solien v. 

United Steelworkers of Am., 593 F.2d 82, 88 n.3 (8th Cir.), cert. 

denied, 444 U.S. 828 (1979), it is not for this court to pass 

upon them during the quintessentially preliminary inquiry that

section 10(l) entails. Rather, "[t]he Board should consider the

claims in question, and its determinations with respect to them

will be subject to review here if any direct proceeding is

commenced in this court . . . ." Id. 

To sum up, it is not the responsibility of the courts

to override the Regional Director's interpretation of the facts

when that interpretation is rationally supported by the record.

Applying this generous standard, we approve the lower court's

holding that the Regional Director had reasonable cause to

believe that the Union's practice of group shopping was in

potential violation of section 8(b)(4)(ii)(B).

2. Legal Theory. We turn next to the question of 2. Legal Theory. 

whether the instant case fits within the legal contours of
 

10It is of some significance that we are here not addressing
generally nonobstructive activity at the perimeter of an
employer's business situs, as in DeBartolo, but, rather, 
inherently obstructive activity (even if marginally expressive)
conducted inside the establishments of secondary businesses 
activity which could unduly "bring [these] neutral, secondary
employers into a labor dispute in order to apply pressure on the
primary employers," Brian K. Beard, Comment, Secondary Boycotts 
After DeBartolo: Has the Supreme Court Handed Unions a Powerful 
New Weapon?, 75 Iowa L. Rev. 217, 233 (1989), and thereby 
undermine the prescriptive purpose of section 8(b)(4)(ii)(B).

20

section 8(b)(4)(ii)(B). Having mulled the Regional Director's

theory that the Union's group shopping amounted to an

unlawfully coercive secondary boycott we conclude that it is

sufficiently colorable.

The legal significance of the practice of group

shopping is a matter of first impression. But, the novelty of a

Regional Director's legal theory should rarely, in and of itself,

foreclose the availability of injunctive relief under section

10(l). Novelty

does not necessarily signify insubstantiality. See, e.g., 

Hendrix, 592 F.2d at 442-43; Squillacote, 540 F.2d at 858; Boire 

v. International Bhd. of Teamsters, Etc., 479 F.2d 778, 790 (5th 

Cir. 1973); cf. EEOC v. Steamship Clerks Union, Local 1066, 48 

F.3d 594, 607 n.13 (1st Cir. 1995) ("It would be a peculiar rule

of construction if a statute could not be applied in a certain

manner unless it had already been applied in that manner in a

previous case."), petition for cert. filed, 63 U.S.L.W. 3874 

(U.S. May 26, 1995) (No. 94-1953). Thus, we hold that a novel

legal theory may, if plausible, provide an appropriate foundation

for a section 10(l) injunction.

We have little difficulty in finding that the Union's

group shopping plausibly could be deemed a coercion-based

secondary boycott under section 8(b)(4)(ii)(B) and, hence, that

there is adequate legal substance behind the issuance of the

injunction. The language of section 8(b)(4)(ii) "is pragmatic in

its application, looking to the coercive nature of the conduct,

21

not to the label which it bears." Local Union No. 25, 831 F.2d 

at 1153 (citation and internal quotation marks omitted).

Although group shopping, as conducted by the Union in this case,

is a new twist and may not fit the traditional conception of a

secondary boycott, see, e.g., Denver Bldg. & Constr. Trades, 341 

U.S. at 687 (describing a classic secondary boycott), this

qualification mostly serves to earn the Union high marks for

ingenuity. Coercion under section 8(b)(4)(ii)(B) is a broad

concept, and the NLRB has not hesitated to include varied forms

of economic pressure within the conceptual ambit. See, e.g., 

International Union, United Mine Workers of Am., 304 N.L.R.B. 71, 

72-73 (1991) (finding unlawful coercion where union members

caused a disturbance at a motel housing striker replacements,

reasoning that the motel was a neutral employer and the union

activity could pressure it to terminate its relationship with the

labor supply contractor in order to force the latter to cease

doing business with the primary employer), enforced, 977 F.2d 

1470 (D.C. Cir. 1992); Local No. 742, United Bhd. of Carpenters & 

Joiners of Am., 237 N.L.R.B. 564, 565-66 (1978) (finding that a 

union's quid pro quo request for premium pay from a neutral

employer was unlawfully coercive because it was actually an

effort to cause the modification of that employer's relationship

with another employer); Service & Maintenance Employees Union, 

Local 399, 136 N.L.R.B. 431, 436-37 (1962) (holding that a 

union's generally nonexpressive marching around the main entrance

of a sports arena, impeding public access, constituted unlawful

22

coercion). Here, though one can imagine more significant forms

of economic pressure than associational shopping, we nonetheless

believe that the Regional Director's legal theory is sufficiently

substantial that the district court's approbatory conclusion must

be left intact.11

3. Just and Proper. We come finally to the question 3. Just and Proper. 

of whether the injunctive relief structured below can be deemed

just and proper in light of the relevant factual and legal

circumstances. We conclude that it can.

The district court held that injunctive relief is just

and proper in this case because of its relationship to two

statutory goals: (1) to prevent disruptions in the flow of

commerce, and (2) to protect innocent third parties from becoming

embroiled in a labor dispute. See Pye, 875 F. Supp. at 928. 

This threshold determination rests on empirical and legal

bedrock. It is indisputable that the statutory proscription of

secondary boycotts contemplates both the maintenance of an

unhindered stream of commerce, see, e.g., Hoeber, 939 F.2d at 

122; Union de Tronquistas, 586 F.2d at 878, and the shielding of 

secondary businesses from unlawful intrusions, see, e.g., 

International Longshoremen's Ass'n, 456 U.S. at 223 n.20; Denver 
 

11Of course, this ruling means only what it says, and does
not speak to whether the Union's contrary view may prevail in the
long run. That question is not before us at this time. See, 
e.g., Madden v. International Hod Carriers', Bldg. & Common 
Laborers' Union of Am., Local No. 41, 277 F.2d 688, 690 (7th 
Cir.) (explaining that "[t]he ultimate determination on the
merits as to whether a violation occurred is reserved exclusively
for the Board, subject to judicial review" at the appropriate
time), cert. denied, 364 U.S. 863 (1960). 

23

Bldg. & Constr. Trades, 341 U.S. at 692. After all, "[a] union 

has a right to press a recalcitrant employer within the limits of

the law; but, [a secondary business] has an equal and correlative

right to be protected from becoming a union pawn in an end game

directed at some other employer." Local Union No. 25, 831 F.2d 

at 1152. On this basis, then, temporary injunctive relief of

some sort is clearly just and proper.

Starting from this major premise, our focus necessarily

becomes the scope of the decree that the lower court actually

entered. The Union tells us that the decree is vague and

overbroad. We reject this characterization. The injunction's

prohibitory ambit is quite clear and its contours are rather

specific. Short of cataloguing each and every potential

violation, we do not see what further particularization the

district court could reasonably have inserted. The requirement

that temporary injunctions be clear and specific, Fed. R. Civ. P.

65(d), does not mean that they must read like the working plans

for building hydrogen bombs. See Pacific Maritime Ass'n v. 

International Longshoremen's & Warehousemen's Union, 517 F.2d 

1158, 1162-63 (9th Cir. 1975).

We likewise fail to discern any merit in the Union's

allegation of overbreadth. The injunction carefully proscribes

certain types of activity, aimed at secondary businesses,

undertaken by the Union and other denominated individuals, with a

specific (unlawful) intent. No more is exigible.

The Union's last-ditch argument is that the injunction

24

should be expressly limited in duration, particularly since it

will remain operative until the Board acts, and that agency may

not reach a decision on the merits for some time. In support of

this argument, the Union cites Eisenberg v. Hartz Mountain Corp., 

519 F.2d 138 (3d Cir. 1975), in which the court held that section

10(j) injunctions, absent extraordinary circumstances, should be

confined to six months in duration. See id. at 144. The Union's 

reliance on Eisenberg is unavailing. For one thing, that case 

involves section 10(j), not section 10(l), and the differences

between the two provisions are not insignificant. See supra note 

7 (contrasting the two provisions); see also Maram, 722 F.2d at 

957-58 (explaining why the range of considerations affecting the

propriety of injunctive relief varies between sections 10(j) and

10(l)). For another thing, several other circuits have expressly

declined to adopt the Third Circuit's inelastic six-month rule,

instead leaving the matter of duration to be decided by

individual district courts on a case-by-case basis. See, e.g., 

Sheeran v. American Commercial Lines, Inc., 683 F.2d 970, 980-81 

(6th Cir. 1982); Kaynard, 633 F.2d at 1035; Dawidoff v. 

Minneapolis Bldg. & Constr. Trades Council, 550 F.2d 407, 414 

(8th Cir. 1977); Squillacote, 540 F.2d at 860. Hendrix typifies 

the reasoning of those courts. There, the Eighth Circuit stated:

"We find the congressional history indicates that Congress was

aware of the lengthy Board hearing procedures when Section 10(l)

was enacted. Since Congress did not impose a time limit on a

Section 10(l) injunction, we find no reason why this Court should

25

impose such a limit." Hendrix, 592 F.2d at 446. 

A measure of adjudicatory delay is one of the crosses

that contemporary litigants must bear. See, e.g., Maram, 722 

F.2d at 960 ("A busy administrative agency cannot operate

overnight. The very fact that it must exercise discretion, and

that its decision is entitled to presumptive weight, indicate

that it should have time to investigate and deliberate.")

(footnote and citation omitted). Thus, we abjure the Third

Circuit's rule and hold, instead, that the question of whether an

injunction issued under section 10(l) should be temporally

limited and, if so, to what extent is a matter within the

sound discretion of the district court.

We add an eschatocol of sorts. By declining the

Union's invitation to sponsor a per se durational rule, we in no

way intend to condone needless delay in the administrative

adjudicatory process. We anticipate that the Board will proceed

with dispatch to decide the merits of all section 10(l) cases.

If this prediction proves to be overly optimistic in a particular

instance, the Union may, if it can make a credible showing that

the Board's delay is genuinely undue, ask the district court to

modify or dissolve the temporary injunction. See, e.g., Asseo, 

805 F.2d at 29 (suggesting that the Regional Director's request

for a temporary injunction should be taken as "a promise of a

speedy [administrative] disposition, with the risk of

dissolution, or modification, by the court, on motion . . ., if

the promise is not kept"); Solien, 593 F.2d at 88 (suggesting 

26

that if agency action is unreasonably delayed in a section 10(l)

case, a union may seek a modification or dissolution of the

challenged injunction in the district court).

III. CONCLUSION III. CONCLUSION

We need go no further. The temporary injunction, as

granted, is grounded in the Regional Director's supportable

finding of reasonable cause, rests on a credible legal theory,

and is suitable in both its proscriptive reach and its temporal

scope. Accordingly, we uphold it in all respects.

Affirmed. Affirmed. 

27